UNITED STATES of America,
Plaintiff,

v.

Charles Roy McMILLAN, Defendant.

No. Civ.A. 3:95–CV633WS.

United States District Court,
S.D. Mississippi,
Jackson Division.

March 31, 1999.

Mitzi Dease Paige, U.S. Attorney's Office, Jackson, MS, Pamela K. Chen, Margo J. Schlanger, U.S. Department of Justice, Civil Rights Division, Washington, DC, Shelley R. Jackson, U.S. Department of Justice, Special Litigation Section, Civil Rights Division, Washington, DC, for United States of America, plaintiff.

Nathan W. Kellum, Stephen M. Crampton, Brian Fahling, American Family Association Law Center, Tupelo, MS, for Charles Roy McMillan, defendant.

### MEMORANDUM OPINION AND ORDER

WINGATE, District Judge.

This case is before the court pursuant to the motion of the United States to find the defendant Charles Roy McMillan (hereinafter "McMillan") in contempt of a Consent Decree dated June 27, 1996, wherein McMillan agreed to refrain from "[u]sing force or threats of force to interfere with or intimidate employees or patients of the Jackson Women's Health Organization (hereinafter 'JWHO') in violation of the Freedom of Access to Clinic Entrances Act (hereinafter 'FACE') statute," Title 18 U.S.C. § 248, et seq.[1]

On October 10, 1996, Dawn Johnson, an employee of the New Woman's Medical Clinic (a division of JWHO), audio-taped the following phrase uttered by Roy McMillan as he stood on a stool outside the clinic: "Where's a pipebomber when you need him?" According to the United States, the utterance was made several times over a period of weeks, particularly when Dr. John Stoppel, a physician working at the New Women's Medical Clinic, would arrive at the clinic accompanied by a security guard. The United States contends that McMillan's utterance constitutes a violation of the Consent Decree. Thus, says the United States, McMillan should be held in civil contempt. Additionally, the United States contends that McMillan's conduct violates FACE. Therefore, says the United States, McMillan should be enjoined: from coming within fifty (50) feet of the New Women's Medical Clinic, within fifty (50) feet of Dr. Stoppel's house, or within thirty (30) feet of Dr. Stoppel himself or any vehicle in which Dr. Stoppel is riding; ordered to pay Dr. Stoppel $5,000.00 in compensatory damages; directed to pay the costs and other expenses of litigation; and further directed that any future violation of the Consent Decree will result in the imposition of a $1,000.00 fine.

McMillan disputes the assertions of the United States, contending that his comments were nothing more than prayerful utterances directed at no person or persons in particular. Thus, the question to be determined by this court in this proceeding is whether Roy McMillan's actions and utterances constitute a violation of the aforesaid Consent Decree for which McMillan should be held in civil contempt and/or an actionable threat under FACE.

### THE CONSENT DECREE AND THE FEDERAL STATUTE

This matter originally was brought before this court pursuant to a motion for injunctive relief brought by the United States against McMillan. This matter was

---

**1.** Title 18 U.S.C. § 248(c)(2)(A) provides that, "[i]f the Attorney General of the United States has reasonable cause to believe that any person or group of persons is being, has been, or may be injured by conduct constituting a violation of this section, the Attorney General may commence a civil action in any appropriate United States District Court."

heard on October 26, 27 and 30, 1995. The United States called seven (7) witnesses, most of whom are/were employees of the JWHO, seeking to show that on at least three occasions McMillan violated both the spirit and the particular provisions of FACE. The United States' witnesses testified that McMillan told clinic employees that "ya'll look like a bunch of birds on a telephone wire waiting to be shot off by a man with a shotgun." Then, according to the testimony, McMillan made his hand into the shape of a pistol by extending his index finger, lifting his thumb, and pointing at the employees as if he were shooting, and saying "pow, pow, pow, pow." Additionally, according to the United States, McMillan told a contractor, one Joseph Vestal, who was performing repairs at the JWHO clinic that he should be burning the clinic down instead. Moreover, according to the United States, McMillan asked for the contractor's name and telephone number, ostensibly to discuss the possibility of arranging for the arson of the clinic. Finally, according to the United States, McMillan committed yet another violation of FACE when he warned a patient and her escort as they were leaving the JWHO clinic that in twenty-four hours God was going to destroy the individuals who worked in the clinic. Thus, the patient was being warned not to be at the clinic the next day because the destruction was going to occur.

On December 27, 1996, this court entered its Memorandum Opinion and Order granting the injunctive relief requested. The Memorandum Opinion and Order also found FACE to be validly enacted and constitutional. While the case was pending further proceedings before this court, the parties announced that they had entered into an agreement which enjoined McMillan from violating FACE while permitting McMillan to admit no liability. By the terms of the Consent Decree, this court retains jurisdiction to ensure compliance. The United States, by and through the United States Attorney, retains power to seek enforcement and any appropriate legal remedy in the event McMillan fails to abide by the Consent Decree. McMillan agreed to refrain from uttering threats of force to intimidate employees of the clinic. Essentially, McMillan has agreed to abide by the provisions of FACE; hence, a finding of contempt in the instant case also may constitute a finding that the provisions of FACE have been violated.

Enacted May 26, 1994, FACE prohibits, among other things, anyone, who "by force or threat of force or by physical obstruction, intentionally injures, intimidates or interferes with or attempts to injure, intimidate or interfere with any person because that person is or has been, or in order to intimidate such person or any other person or any class of persons from, obtaining or providing reproductive health services." *See* Title 18 U.S.C. § 248(a)(1).[2] The aim of FACE is ". . . to protect and promote the public safety and health and activities affecting interstate commerce by establishing Federal criminal penalties and civil remedies for certain violent, threatening, obstructive, and destructive conduct that is intended to injure, intimidate or interfere with persons seeking to obtain or provide reproductive health services." *See* Section 2 of Pub.L. 103–259.[3] This statement also embodies the aim of the Consent Decree entered into between the United States and Roy McMillan on June 27, 1996. The movant in a civil contempt proceeding bears the burden of establishing by clear and convincing evidence: (1) that a court order was in effect; (2) that the order required certain conduct by the respondent; and (3)

---

**2.** The Consent Decree employees this same language.

**3.** FACE also seeks to protect the right to terminate a pregnancy, a right which, according to the United States Supreme Court, falls

squarely within the rights guaranteed by the Fourteenth Amendment. *See Planned Parenthood of Southeastern Pennsylvania v. Casey,* 505 U.S. 833, 112 S.Ct. 2791, 2807, 120 L.Ed.2d 674 (1992).

that the respondent failed to comply with the court's order. *Whitfield v. Pennington,* 832 F.2d 909, 913 (5th Cir.1987), *cert. denied, Pennington v. McLaughlin,* 487 U.S. 1205, 108 S.Ct. 2846, 101 L.Ed.2d 883 (1988); *Petroleos Mexicanos v. Crawford Enterprises.,* 826 F.2d 392, 401 (5th Cir. 1987); and *Northside Realty Assocs. v. United States,* 605 F.2d 1348, 1352 (5th Cir.1979). Thus, the provisions of the Consent Decree and FACE are intertwined in a manner that in the instant case may lead to the conclusion by the court that both have been violated.

## PERTINENT FACTS

Pursuant to the United States' motion to hold defendant Charles Roy McMillan in contempt, this court held a hearing including all of the parties on March 14, 1997. At that hearing, the United States called only two witnesses: Deputy United States Marshal Rhett W. Anthony who measured the dimensions of the New Women's Medical Clinic; and Dr. John Stoppel. Dr. Stoppel testified that McMillan shouts, "where is a pipebomber when you need one," when Dr. Stoppel arrives at and walks into the clinic. Stoppel stated that he is aware of McMillan's view regarding violence to prevent abortion—that killing a doctor who performs abortions would not be immoral. Thus, says Stoppel, he is intimidated by this utterance and perceives it as a personal threat.

Dr. Stoppel testified that he was intimidated because there have been bombings and shootings at other clinics. Stoppel compared McMillan's comment about needing a pipebomber to one saying that there is a bomb in one's luggage when boarding an aircraft—a remark that would be regarded seriously by airport authorities because bombings of aircraft do occur and are a constant threat. Dr. Stoppel also testified that McMillan was directing his remarks specifically at him, stating as follows:

Q: Does Mr. McMillan ever yell at you in particular?

A: Yes, he does.

Q: When is that?

A: When I enter the clinic every morning when he is there.

Q: And what does he usually say? ...

A: ... things like: Oh, there is a special place in hell, baby killer, murderer, things like that.

Q: And did there come a time when his message changed?

A: Yeah.

Q: And what did he begin to say then?

A: Well, I don't remember exactly when it was. I think it was late last year he started saying ... and that was when the Unibomber was in the newspapers. He said: Where is the pipe bomber when you need him?

Q: Who would he be telling that to?

A: He would be telling it to me.

Q: How often did he say that?

A: Every day when I went to the clinic.

Q: What was his tone of voice?

A: It sounded threatening to me.

Q: Was he loud or soft?

A: Loud. He has to be loud, because he has to reach the 80 some odd feet so that I can hear him.

*   *   *   *   *   *

Q: How long did that go on for?

A: Probably 6 to 8 weeks.

*   *   *   *   *   *

Q: Did you feel that statement, where is a pipebomber when you need him, did you think that was a threat?

A: Yeah.

Q: What was it a threat of?

A: A threat of, you know, knowing what I know about him, stupidly saying its too bad I don't know a pipe bomber because I would sick him on you.

Dr. Stoppel later clarified on cross-examination that McMillan's utterances caused him to fear that McMillan would hire someone to place a pipe-bomb at the clinic, rather than do it himself, and that this could be accomplished at any time a pipe-bomber made his presence known to McMillan.

After the United States rested its case, Harriet Ashley testified on behalf of McMillan. Ashley stated that she often has demonstrated at the clinic with McMillan and acknowledged that she heard McMillan make the "pipebomber" statement. On at least three occasions, she expressed her opinion that the statement was not threatening—saying that the statement was not directed at Dr. Stoppel in particular; that the statement was "off-the-cuff," and that she had never seen McMillan threaten anyone. Ashley also stated that she "understood" why McMillan made such statements, thereby implying that he had a motive or purpose for what he was doing. Ashley referred to McMillan's statement as expressing a "theological" point of view, and that while she did not herself advocate violence, she understood why McMillan would say that harm to doctors and employees at the clinic would be "ok."

Next on behalf of McMillan was Robert Lee Ainsworth, a pro-life activist sympathetic to McMillan, who testified that McMillan had a reputation in the community of being a peaceful person. On cross-examination, however, Ainsworth admitted that he was aware of a petition signed by Roy McMillan and disseminated by a group known as the "Defenders of the Defenders of Life" which states essentially

that killing doctors and employees at abortion clinics is not morally wrong and that those arrested for such acts should be acquitted.[4]

Finally, Roy McMillan testified on his own behalf. McMillan did not deny making the "pipebomber" statement, but contended that the utterance does not constitute either contempt nor an actionable threat under FACE. McMillan also contended that at the time he first made this utterance, the news was full of reports concerning the bombing of the Olympic Games in Atlanta, Georgia, and the arrest and prosecution of the "Unibomber." McMillan insists that his comment was nothing more than a reference to those incidents and not a specific threat. Moreover, says McMillan, if his comment is to be construed as directed at anything, then it was to the clinic itself, an inanimate building, and not toward any individual.

McMillan denied that he ever made a threat directly to Dr. Stoppel. However, McMillan admitted that when he conducts his protests at the New Women's Medical Clinic he observes Dr. Stoppel arriving at the clinic with a security guard and speaks directly to him as Dr. Stoppel exits the car and steps into the building. McMillan estimated the time that it took Dr. Stoppel to go from the car to the clinic to be from three to five seconds. Notwithstanding that he knows exactly when Dr. Stoppel arrives at the clinic and can estimate how long it takes for Dr. Stoppel to leave his car and enter the building, McMillan still denied that his comment regarding the need for a pipebomber were directed at Dr. Stoppel individually. However, he

---

4. This petition was admitted during the preliminary injunction hearing conducted before this court in October of 1996. Apparently circulated after an incident in Pensacola, Florida, where one Paul Hill shot and killed a Dr. John Britton and his bodyguard at an abortion clinic, the petition declares:

We, the undersigned, declare the justice of taking all godly action necessary, including the use of force to defend innocent human life (born and unborn). We pro-

claim that whatever force is legitimate to defend the life of a born child is legitimate to defend the life of an unborn child.

We declare and affirm that if in fact Paul Hill did kill or wound abortionist John Britton and accomplices James Barrett and Mrs. Barrett, his actions are morally justified if they were necessary for the purpose of defending innocent human life. Under these conditions, Paul Hill should be acquitted of all charges against him.

does not deny that he yells this comment loudly, so that it may be heard at a distance, approximately 80 feet away, where Dr. Stoppel routinely exits his vehicle.

McMillan acknowledged that he had no qualms about burning down a facility such as the New Women's Medical Clinic, comparing that to the burning of a slave-ship or a Nazi concentration camp, and responding that all these were justifiable acts. McMillan then acknowledged that one could be "called" to make threats of violence upon those who worked at abortion clinics in order to stop abortions, while refraining from acting on one's threats:

Q: Surely you don't believe it's a sin then to threaten an abortionist, do .you?

A: I haven't given that any thought.

\* \* \* \* \* \*

Q: Yet you haven't given any consideration you say even though you wrote a seven-page piece on use of force against abortion providers, you haven't considered whether threatening an abortionist would be a sin?

A: That position paper was not written to abortionists. It was—

Q: The question is you gave that position paper some consideration, did you not?

A: Yes.

Q: And you agonized probably over your theological opinions in that paper, did you not?

A: Yes, certainly and still do I agonize.

Q: And yet you didn't consider whether or not you thought threatening an abortionist was a sin?

A: That was not the question of the position paper.

Q: Do you have a position at this time?

A: I haven't given it any thought because no one has ever asked me about threaten. I reacted as a result of Paul Hill and other people who defended the innocent. They used lethal force to stop lethal force against the innocent.

Q: You realize, of course, you have been charged with threatening abortion providers in Jackson, is that correct?

\* \* \* \* \* \*

A: Yes. I am aware of abortionist Stoppel's testimony.

Q: You are also aware you are accused of threatening other members of the Jackson Women's Health Organization, are you not?

\* \* \* \* \* \*

A: I'm aware that this was the hearing of a year and a half ago whenever we were in this courtroom about the incident where I was accused of doing things by abortion clinic employees and I had very little response because I had no witnesses.

Q: Did it cause you to ponder at all though whether or not it would be sin to threaten an abortionist?

A: No. There is a difference in having a position and acting on a position in my opinion.

Q: One would take guts, is that correct, to act on a position?

A: Or believe that that's what God would have them do. Dietrich Bonhoffer discussed that in his cost of discipleship when he recognized he believed it was his position to try to bring down the third reich while he would not condemn others who did not. Some people are called to do that and some aren't. And he was hung for going against the Third Reich, who was legally killing innocent human beings.

Q: It is possible that some people may be called to make threats but not carry them out in an effort to stop abortion?

A: That's possible.

## ANALYSIS

### 1. Weighing the Witnesses' Credibility

When the House of Representatives issued House Report No. 103–306 recommending passage of Title 18 U.S.C. § 248 (FACE), the House Subcommittee had heard testimony from Dr. Norman Tompkins, an obstetrician and gynecologist at the Margot Perot Center in Dallas, Texas, who had been the victim of ongoing targeted intimidation because he does abortions. The House Subcommittee also had heard from: Mr. Randall Terry, founder of Operation Rescue and active promoter of training in personal harassment techniques; Reverend Joseph Foreman, President of Missionaries to the Preborn, also a proponent of doctor-targeted harassment and intimidation; and Mr. Jeff White, Director of Operation Rescue for California and originator of the "No Place to Hide" campaign of harassment toward doctors. While there is nothing in the record which directly links Roy McMillan to any of these individuals, it is not beyond logical conclusion that McMillan might be familiar with these individuals or, at least, their writings and techniques. Certainly, the testimony in the instant case establishes ample foundation for the conclusion that McMillan is employing a "no place to hide" strategy against Dr. Stoppel, or a very similar ploy, regardless of whether he actually has familiarized himself with particular ideas of those individuals named in House Report No. 103–306.

McMillan says his comment was an open expression which, as he would have this court believe, was directed at no individual or group. However, the period of time within which he continued to shout about the need for a pipebomber, coupled with McMillan's timing of his comment—making sure it was said when Dr. Stoppel was present and could hear it—combine to sug-

gest that McMillan's testimony to this court was less than forthcoming. There is an appearance here of stretching the fabric of the Consent Decree as far as it will go which this court finds disturbing.

Therefore, this court is persuaded that the weight of credibility disfavors McMillan. In reaching its decision, this court took into account the demeanor of the witnesses [5] and the logical consistency of their respective versions of what happened at the New Women's Medical Clinic. Additionally, this court took into its calculus of credibility that McMillan openly preaches defiance of the civil law and openly advocates violence—even murder. He proclaims that it is not a sin to wound or injure an abortion provider. He openly announces that it is not a sin to murder an abortion provider. While denying that he personally would ever take a life, he cheers on those who would do so and apparently hopes to persuade others to accept his views. It follows then that one who has advocated violence in public writings and even in the media would threaten that very same violence when confronted with the people he scorns. Moreover, inasmuch as McMillan endorses the assault and murder of abortion providers to further his ends, it is no great step to presume that McMillan also would excuse lying under oath in order to further his ends and undermine the credibility of those opposed to his position. So, this court concludes that Dr. Stoppel has presented the more credible testimony in the instant case.

### 2. What Constitutes a Threat under FACE—Legislative History

House Report 103–706 states that Subsection 248(a)(1) of Title 18 U.S.C. prohibits the use of force or threat of force, or physical obstruction that intentionally injures, intimidates [6] or interferes with any

---

5. This court noted McMillan's thinly concealed hostility toward Dr. Stoppel, referring to him as "the abortionist" and "abortionist Stoppel," thereby openly expressing his scorn and loathing.

6. Title 18 U.S.C. § 248(e)(3) defines "intimidat[ion]" as that conduct which "place[s] a person in reasonable apprehension of bodily harm to him- or herself or to another."

person (or attempts to do so) because that person, or any other person or class of persons, is or has been obtaining or providing reproductive health services. This section, says the Report, is modeled on other federal civil rights laws such as Title 18 U.S.C. § 245(b), which prohibits the use or threatened use of force to willfully injure, intimidate or interfere with (or attempting to do so) "any person because he is or has been, or in order to intimidate such person or any other person or any class of persons from" voting, engaging in activities related to voting or enjoying the benefits of federal programs. Another law, with virtually identical operative language, noted the Report, is Title 42 U.S.C. § 3631, a provision of the Fair Housing Act that prohibits force or threat of force to willfully injure, intimidate, or interfere with a person's housing opportunities because of his or her race, color, religion, sex or national origin. Thus, says the Report, Subsection 248(a)(1) would cover acts of force, threats of force and physical obstruction that intentionally injure, intimidate or interfere with any person, if these actions are undertaken because the victim or others are obtaining or providing reproductive health services.

The types of acts of force recognized by the Report to be covered by Subsection 248(a)(1) include physical assaults such as: the murder of Dr. David Gunn in Florida and the shooting of another doctor in Kansas; beatings and any other physical attacks; and vandalism such as tampering with the car of a physician in order to cause an accident or using super-glue on door locks. On the other hand, threats of force, says the Report, are those which are "legitimately interpreted as serious expressions of an intention to inflict bodily harm. The threats must be real and meaningful, not merely rhetorical or political hyperbole." See United States v. Gilbert, 884 F.2d 454 (9th Cir.1989), cert. denied, 493 U.S. 1082, 110 S.Ct. 1140, 107 L.Ed.2d 1044 (1990), citing Watts v. United States, 394 U.S. 705, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969). Many of the death threats and threats of violence received by abortion providers, said the Report, are specific enough to be covered by the Act and would be covered wherever they occur—and not just at the clinic.

Senate Report 103–117 notes that FACE is not legislation against "viewpoint discrimination" or "thought crimes," and that FACE would not punish anyone for holding the view that abortion is wrong, or for expressing opposition to abortion in peaceful, non-obstructive ways. Rather, says the Senate Report, FACE establishes penalties for engaging in certain constitutionally unprotected conduct such as "true threats" based on a prohibited motive. Citing Watts v. United States, the Senate Report says that a threat of force is a "true" threat if a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates it as a serious expression of an intention to inflict bodily harm. Nothing in the Bill of Rights, says the Report, prevents Congress from requiring anti-abortion demonstrators to obey certain rules against violence, obstruction and threats of force in the manner adopted by FACE.

Therefore, according to the legislative history, FACE contemplates threats of force as "true threats" when they are meaningful and legitimately may be interpreted as serious expressions of an intention to inflict bodily harm, or when the person uttering the threat could foresee that the statement would be interpreted by those to whom it is communicated as a serious expression of an intention to inflict bodily harm. See Cheffer v. Reno, 55 F.3d 1517, 1521 (11th Cir.1995), where the Eleventh Circuit construed the "reasonable apprehension" language in FACE to require "a threat of physical force placing a person in reasonable apprehension of bodily harm;" United States v. Brock, 863 F.Supp. 851, 857 (E.D.Wis.1994), finding that the "reasonable apprehension" language in FACE was "a reasonable attempt

to limit application of the statute to 'true threats,'" citing *United States v. Aman,* 31 F.3d 550, 553 (7th Cir.1994) (defining a threat as "whether the recipient could reasonably have regarded the defendant's statement as a threat"); and *Wurtz v. Risley,* 719 F.2d 1438, 1441 (9th Cir.1983) ("implicit in the nature of such punishable threats is a reasonable tendency to produce in the victim a fear that the threat will be carried out").

### 3. *Case Law*

There is a dearth of cases in the Fifth Circuit discussing what has been or might be determined to constitute an actionable threat under Title 18 U.S.C. § 248(a)(1) (FACE). *See Cook v. Reno,* 74 F.3d 97 (5th Cir.1996) (remanding plaintiff's challenge to enforcement of FACE to district court to allow the plaintiffs the opportunity to amend their complaint and for reconsideration by the trial judge on the issues of jurisdiction and standing). *See also United States v. Bird,* 124 F.3d 667 (5th Cir. 1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1189, 140 L.Ed.2d 320 (1998) (finding FACE to be a legitimate regulation of intrastate activity, neither overbroad nor vague, and upholding condition that protestor stay at least 1000 feet away from clinic after shouting to doctor, "I will kill you," and throwing a bottle at doctor's car). No other cases addressing Title 18 U.S.C. § 248(a)(1) have emerged in the Fifth Circuit at this time. However, in *United States v. Daughenbaugh,* 49 F.3d 171 (5th Cir.1995), the Fifth Circuit gave an indication of how it views threats of force when it found a letter containing the statement that a new government was coming to power in which all federal judges would be executed constituted a threat of injury which violated Title 18 U.S.C. § 876.[7] This statute prohibits use of the mails to transmit a communication containing a threat of injury. *Id.* at 173.

One Circuit Court decision which addresses Title 18 U.S.C. § 248 and the question of what constitutes a threat of force prohibited by FACE is *United States v. Dinwiddie,* 76 F.3d 913 (8th Cir.1996), *cert. denied,* 519 U.S. 1043, 117 S.Ct. 613, 136 L.Ed.2d 538 (1996). In *Dinwiddie,* the Eighth Circuit addressed the matter of when mere words constitute an actionable threat under FACE, stating:

> When determining whether statements have constituted threats of force, we have considered a number of factors: the reaction of the recipient of the threat and of other listeners, see *J.H.H.,* 22 F.3d at 827; whether the threat was conditional, see *Bellrichard,* 994 F.2d at 1321; whether the threat was communicated directly to its victim, *see ibid.;* whether the maker of the threat had made similar statements to the victim in the past, see *United States v. Whitfield,* 31 F.3d 747, 749 (8th Cir.1994); and whether the victim had reason to believe that the maker of the threat had a propensity to engage in violence. *See ibid.* This list is not exhaustive, and the presence or absence of any one of its elements need not be dispositive. *See, e.g., Bellrichard,* 994 F.2d at 1322 ("A threat may be considered a 'true threat' even if it is premised on a contingency").

*Id.* at 925. *See United States v. Bellrichard,* 994 F.2d 1318, 1322 (8th Cir.), *cert. denied,* 510 U.S. 928, 114 S.Ct. 337, 126 L.Ed.2d 282 (1993); and *United States v. J.H.H.,* 22 F.3d 821 (8th Cir.1994). The *Dinwiddie* Court noted that:

> the First Amendment does not permit the government to punish speech merely because the speech is forceful or aggressive. What is offensive to some is passionate to others. The First Amendment, therefore, requires a court (or a jury) that is applying FACE's prohibi-

---

7. Title 18 U.S.C. § 876 provides in pertinent part that "[w]hoever knowingly so deposits or causes to be deposited as aforesaid, any communication with or without a name or designating mark subscribed thereto, addressed to any other person and containing any ... threat to injure the person of the addressee or of another, shall be fined under this title or imprisoned not more than five years, or both."

tion on using "threats of force," to differentiate between "true threat[s]," *Watts,* 394 U.S. at 708, 89 S.Ct. at 1401, and protected speech. The court must analyze an alleged threat "in the light of [its] entire factual context," *Lee,* 6 F.3d at 1306 (Lay, J., concurring in part and dissenting in part), and decide whether the recipient of the alleged threat could reasonably conclude that it expresses "a determination or intent to injure presently or in the future." *Martin v. United States,* 691 F.2d 1235, 1240 (8th Cir. 1982), *cert. denied,* 459 U.S. 1211, 103 S.Ct. 1207, 75 L.Ed.2d 447 (1983).

*See United States v. Lee,* 6 F.3d 1297, 1301 (8th Cir.1993) (en banc), *cert. denied,* 511 U.S. 1035, 114 S.Ct. 1550, 128 L.Ed.2d 199 (1994) (case brought pursuant to Title 18 U.S.C. § 241[8] for civil rights conspiracy, where the jury was improperly instructed that to convict they need not find a threat of physical force of intimidation of physical fear); and *Watts v. United States,* 394 U.S. 705, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969).

■■■■■ Therefore, if the standards set forth in *Dinwiddie* are to be followed, a federal court must analyze an alleged threat of force in the light of its entire factual context, taking into consideration such factors as: the reaction of the recipient of the threat and of other listeners;[9] whether the threat was conditional; whether the threat was communicated directly to its victim; whether the maker of the threat had made similar statements to the victim in the past; and whether the victim had reason to believe that the maker of the threat had a propensity to engage in violence. Upon consideration of these factors, and any others the court may find relevant or probative, the court then must decide whether the recipient of the alleged threat could reasonably conclude that it expresses "a determination or intent to injure presently or in the future." This court finds the *Dinwiddie* factors offer a reasonable template for the analysis of the instant case, both as to whether McMillan's utterances constitute contempt of the Consent Decree and as to whether there has been a violation of FACE. *See United States v. Wilson,* 154 F.3d 658, 663 (7th Cir.1998) (agreeing with *Dinwiddie* that FACE is not overbroad or vague and does not discriminate against protected speech and conduct); *United States v. Bird,* 124 F.3d 667 (5th Cir.1997) (same).

Recently, the United States District Court for the Southern District of Alabama adopted the analysis set forth in *Dinwiddie. See Lucero v. Trosch,* 928 F.Supp. 1124 (S.D.Ala.1996).[10] The utterances under consideration by the Alabama federal district court were made by one Father David Trosch, a priest and anti-abortionist, on the popular *Geraldo Show* and on the *Shelly Stewart Show.*[11] Father Trosch specifically stated on the *Geraldo*

---

**8.** Title 18 U.S.C. § 241 provides in part that "[i]f two or more persons conspire to injure, threaten or intimidate any person . . ., [t]hey shall be fined under this title or imprisoned. . . ." The Eighth Circuit opines that to find one guilty under this statute, an actual threat of force or harm must be made. Otherwise, one who expresses racist views on his or her own property would be just as culpable under § 241 as one who directed that act toward a protected person or persons.

**9.** In *United States v. Daughenbaugh,* 49 F.3d 171 (5th Cir.1995), the Fifth Circuit in a mailthreat case under Title 18 U.S.C. § 876 found that the reaction of the recipients of the letters was probative of whether the statements in the letters constituted a threat. Three of the recipients of the letters in this case, all federal judges, took additional precautionary measures.

**10.** The *Lucero* Court previously had denied a defendant's motion to dismiss the plaintiff's complaint on the ground that the defendant's mere utterances were not actionable under FACE. *See Lucero v. Trosch,* 904 F.Supp. 1336 (S.D.Ala.1995) (finding the matter to be a question for the finder of fact).

**11.** On the *Shelly Stewart Show,* Father Trosch stated that, "if 20, 30, 40 doctors, abortionists, their staffs were killed, the rest would get out of the business." This comment was not addressed in the Alabama District Court's decision, apparently because no objection to this comment was pursued by the plaintiff.

*Show* that Doctor Bruce Lucero, an obstetrician who performed abortions, "should be dead." Trosch referred to Dr. Lucero as a "mass murderer;" stated that Lucero should be killed and that it would not be murder. Father Trosch then blurted the comment that he would kill Dr. Lucero himself if he had a gun in his hand. "Geraldo" prodded Father Trosch for even more sensational responses, asking him if he had the courage to kill Lucero. Father Trosch then softened his responses, replying only that Lucero "deserves to be dead." Finally, Father Trosch qualified everything he had said by stating that he was merely setting forth a philosophical problem and that his cause was better served by his doing that than by his taking violent action against Dr. Lucero or anyone.

The Alabama federal district court, following *Dinwiddie,* analyzed the alleged threat in the light of its entire factual context and found the *Geraldo* statements to have been made in the highly charged environment of a television program pursuant to the prodding questions of the show-host. Thus, the Court concluded that the comments did not constitute threats of violence as contemplated by Title 18 U.S.C. § 248. *See Lucero,* 928 F.Supp. at 1129–32. However, the Court carefully noted that the First Amendment does not offer refuge for threats of force. Said the Court, "[h]owever, the fact that Fr. Trosch has prevailed in this lawsuit does not mean that he may continue to make statements similar to those he articulated on *Geraldo* with impunity." Moreover, the Court plainly stated that comments such as those uttered on *Geraldo* by Fr. Trosch would have violated FACE, but for the circumstances surrounding the remarks. *Id.* at 1131–32. *See Madsen v. Women's Health Center, Inc.,* 512 U.S. 753, 114 S.Ct. 2516, 2529, 129 L.Ed.2d 593 (1994) (threats to patients or their families, however communicated, are prescribable, notwithstanding the First Amendment); *United States v. Bellrichard,* (the First Amendment affords no protection to those who utter direct threats of force and violence toward other persons); and *United States v. Daughenbaugh,* 49 F.3d at 174 (political rhetoric accompanying threats furnishes no constitutional shield).

The instant case does not present the same highly charged environment as Father Trosch encountered on the *Geraldo Show.* McMillan has testified before to this court that he often demonstrates alone. Thus, there is no one present to prod McMillan into blurting out statements which might be instantly regretted. Instead, the testimony presented to this court shows that McMillan, acting alone or in the presence of other more passive demonstrators, chooses to shout his pipebomber comments at the very time Dr. Stoppel arrives at the clinic. This comment was shouted not once or twice, but many times over a period of time spanning six to eight weeks according the best estimate of Dr. Stoppel. No one contends that this was a "one-time" utterance. According to Dr. Stoppel, McMillan began shouting about the need for a pipebomber at approximately the same time as the news media was carrying stories about the "Unibomber" and the Olympic pipe-bomb incident, and that he continued to do so until this civil contempt action was filed.

### HOLDING

This court finds the circumstances of the instance case more congruent with those presented to the *Dinwiddie* Court than those considered by the *Lucero* Court. In *Dinwiddie,* the District Court found that over a period of months the defendant made approximately 50 comments to a Dr. Robert Crist, an obstetrician who performed abortions, warning Dr. Crist to "remember Dr. Gunn. . . . This could happen to you. . . . He is not in the world anymore. . . . Whoever sheds man's blood, by man his blood shall be shed." Dinwiddie simply may have been quoting aphorisms, but the Eighth Circuit agreed with the district court that these statements

were "threats of force" and that they violated FACE by "intimidating" Dr. Crist and placing him in "reasonable apprehension of bodily harm." It did not concern the Eighth Circuit that Dinwiddie did not specifically say to Dr. Crist, "I am going to injure you." Instead, the manner in which Dinwiddie made her statements, the context in which they were made, and Dr. Crist's reaction to them, according to the Eighth Circuit, all supported the conclusion that the statements were "threats of force" that "intimidated" Dr. Crist. Dinwiddie made these statements not once or twice, but about 50 times. She communicated them directly to Dr. Crist, who reacted to them by wearing a bullet-proof vest. Finally, Dr. Crist was aware that Dinwiddie was a well-known advocate of the view that it is justifiable to use lethal force against doctors who perform abortions.[12]

Of course, the testimony in the instant case establishes that McMillan made his "pipebomber" statements many times prior to the filing of this contempt action. When McMillan first began his "pipebomber" statements, the nation was saddened and shocked by the tragic bombing of the Olympic Games in Atlanta, Georgia, and the arrest and prosecution of the "Unibomber."

Then, relative to Dr. Stopple's state of mind, Dr. Stoppel knew McMillan espoused the view that it is justifiable to use lethal force against doctors who perform abortions. Dr. Stoppel testified that he regarded the statement as a threat and was intimidated by it. Dr. Stoppel said he

took precautions in addition to those he had previously taken, but he asked not to be required to reveal what those precautions were since that might undermine their effectiveness.

█ The circumstances of McMillan's utterances lead this court to conclude that his statements were not conditional. In *United States v. Watts*, the defendant shouted for all to hear at an anti-war rally that "[i]f they ever make me carry a rifle the first man I want to get in my sights is L.B.J." *Watts*, 394 U.S. at 706, 89 S.Ct. at 1401. However, the United States Supreme Court reversed the defendant's conviction for threatening the President because the statement was expressly conditioned on his induction into the Armed Forces; because the statement was not directed at the President; and because the audience responded to Watts by laughing, indicating that those listening regarded the statement to be rhetorical humor rather than a serious threat. *Id.* In the instant case, McMillan repeated his cry when Dr. Stoppel arrived at the clinic over a period of weeks in such a manner as to constantly remind Dr. Stoppel that the services of a pipebomber would be arranged for if one only would present himself. Thus, the statement took on the character of a solicitation. That McMillan's statement had its intended effect is made evident by Dr. Stopple's testimony that while he did not believe McMillan would place a pipebomb, he did fear that McMillan might employ someone else to do so.[13] Furthermore, Dr. Stoppel testi-

---

12. Dr. Crist knew that Dinwiddie had used actual force as well as threats of force when she once attacked the clinic's maintenance supervisor.

13. In the injunction hearing which was conducted prior to entry of the Consent Decree in this case, three witnesses related an incident where McMillan approached one Joseph Vestal, a contractor performing repairs to the clinic, and told Vestal that he should burn down the clinic rather than repair it. Vestal then reportedly replied that if the defendant were to pay him as much as he had been paid

to build it, then it might be possible. McMillan then supposedly stated that such could "be arranged" and attempted to give Vestal his name and telephone number. Vestal and the other witnesses testified that Vestal then brushed McMillan off. The plaintiff asked this court to find that McMillan actually attempted to negotiate a contract with Vestal to destroy the clinic building. This court found it more likely, however, that McMillan was aware that clinic personnel were listening to his conversation with Vestal, and he used the circumstance to threaten and intimidate the clinic workers by his conversation.

fied that he did not consider McMillan's statement to be a joke.

Next, McMillan communicated his statement directly to its intended recipient, Dr. Stoppel. While McMillan would have the court believe that he merely utters the pipebomber statement as a prayer, it is established by the testimony that McMillan stands on a stool so that he may shout and be heard over a six-feet high fence and over a distance of eighty feet toward the arriving automobile of Dr. Stoppel at the very time Dr. Stoppel exits the vehicle to enter the clinic. Therefore, these actions lead this court to the conclusion that McMillan was directing his pipebomber comments specifically to Dr. Stoppel on those occasions when Dr. Stoppel arrived at the clinic.

This court thus finds that the conduct of Charles Roy McMillan here in question was contrary to the provisions and to the spirit of the Consent Decree entered into between the United States and McMillan on June 27, 1996. In that Consent Decree, McMillan agreed to refrain from using threats of force to intimidate employees of the clinic. Clearly, McMillan has not complied with this agreement. Instead, this court finds that McMillan has employed measures to test this court and its decree in order to treat this court's lawful orders as mere sham and inapplicable to what McMillan believes he can do notwithstanding the Consent Decree. Consequently, this court finds that Charles Roy McMillan is in civil contempt of the Consent Decree entered into between him and the United States on June 27, 1996.

■ Additionally, having analyzed McMillan's statements in the light of the entire factual context, taking into consideration those factors set forth in *Dinwiddie*, this court finds that Dr. Stoppel reasonably could conclude that Roy McMillan's statement, repeated over a period of weeks at the time Dr. Stoppel would arrive at the New Women's Medical Clinic, expressed "a determination or intent to injure either presently or in the future" for the purpose of threatening and intimidating Dr. Stoppel because of his activities relating to the provision of reproductive health services. Thus, this court finds that McMillan's actions also constitute a violation of the Freedom of Access to Clinic Entrances Act (FACE).

### *RELIEF*

This court has found that McMillan purposely did not comply with the Consent Decree as he agreed to do and as this court ordered him to do. For this transgression, McMillan is subject to sanctions.

■ Civil, as distinguished from criminal contempt, is a sanction to enforce compliance with an order of the court or to compensate for losses or damages sustained by reason of noncompliance. The purpose is remedial.

■ Civil contempt can serve two different purposes. On one hand, civil contempt is used to enforce, through coerciveness, compliance with a court's order. On the other hand, civil contempt can be used to compensate a party who has suffered unnecessary injuries or costs because of the contemptuous conduct. *See Shillitani v. United States*, 384 U.S. 364, 86 S.Ct. 1531, 1535–36, 16 L.Ed.2d 622 (1966); *United States v. United Mine Workers*, 330 U.S. 258, 67 S.Ct. 677, 701, 91 L.Ed. 884 (1947); *In re Hunt*, 754 F.2d 1290, 1293 (5th Cir. 1985); *Smith v. Sullivan*, 611 F.2d 1050, 1053 (5th Cir.1980); and *United States v. Rizzo*, 539 F.2d 458, 463 (5th Cir.1976).

Title 18 U.S.C. § 401(3) provides that "[a] court of the United States shall have power to punish by fine or imprisonment, at its discretion, such contempt of its authority, and none other, as—(3) [d]isobedience or resistance to its lawful writ, process, order, rule, decree, or command." In addition to this court's contempt powers, Title 18 U.S.C. § 248(c)(2)(A) provides in pertinent part that in any civil action brought by the United States Attorney General, "the court may award appropriate

relief, including temporary, preliminary or permanent injunctive relief, and compensatory damages to persons aggrieved as described in paragraph (1)(B)." Paragraph (1)(B) provides that the costs of the suit, plus reasonable attorney fees and expert witness fees also may be awarded.

■ Therefore, for civil contempt of the Consent Decree, this court imposes on Charles Roy McMillan a fine of $1,000.00 as an appropriate and coercive measure to purge himself of his contempt and assure his future compliance with the Consent Decree. The United States urges this court also to impose a contingent fine of $1,000.00 for each and every future contemptuous act. However, this court finds no basis for issuing this additional contingent fine at this time. Instead, this court shall presume that McMillan will comply with the Consent Decree in the future and refrain from using threats of force and violence to intimidate employees and patients of the clinic. Moreover, if McMillan engages in contumacious conduct in contempt of this court's orders and decrees in the future, this court would not want to be committed to the $1,000.00 figure.

Although the United States asks this court to require McMillan to compensate Dr. John Stoppel for infliction of emotional distress, this court declines to do so, satisfied that the $1,000.00 fine adequately addresses the issue.

The United States also urges this court to enjoin McMillan from coming within thirty (30) feet of Dr. Stoppel, wherever Dr. Stoppel might be. However, the record does not show that McMillan has made any attempt to approach Dr. Stoppel; or has tried to have physical contact with Dr. Stoppel; or has engaged in any conduct which would require imposition of a buffer zone around Dr. Stoppel.[14] Currently, McMillan's threats are hurled from a distance of approximately 80 feet, so a 30–feet buffer zone would serve little purpose

at the clinic. Moreover, Dr. Stoppel testified that he takes prudent security measures to protect himself which this court presumes at this time are adequate. Thus, this court finds no basis for imposing this buffer zone around Dr. Stoppel since there is no evidence that McMillan ever has positioned himself at any distance within proximity of Dr. Stoppel other than the distance between McMillan and Dr. Stopple's vehicle as it arrives at the clinic. This court's concern in the instant case relates to McMillan's threats of injury once Dr. Stoppel exits his vehicle to enter the clinic rather than any attempt to physically interfere with Dr. Stoppel or physically injure him as he goes about his duties.

Finally, this court finds no reason to modify the terms of the Consent Decree at this time by requiring Charles Roy McMillan to remain at any distance from the clinic's driveway entrance greater than is currently required. This court has no desire to curtail the proper expression of McMillan's views with regard to the practice of abortion or his attempts to make others consider and reflect upon their actions. This court is mindful that "[t]here is a 'profound national commitment' to the principle that 'debate on public issues should be uninhibited, robust, and wideopen.'" See NAACP v. Claiborne Hardware Co., 458 U.S. 886, 102 S.Ct. 3409, 3425, 73 L.Ed.2d 1215 (1982), reh. denied, 459 U.S. 898, 103 S.Ct. 199, 74 L.Ed.2d 160 (1982). In Madsen v. Women's Health Center, Inc., 512 U.S. 753, 114 S.Ct. 2516, 2529, 129 L.Ed.2d 593 (1994), the United States Supreme Court stated, "[a]s a general matter, we have indicated that in public debate our own citizens must tolerate insulting, and even outrageous, speech in order to provide adequate breathing space to the freedoms protected by the First Amendment." However, this court will not tolerate threats of force and violence from McMillan upon the persons of others

---

14. Dr. Stoppel admits that McMillan has never approached him and has withdrawn an earlier assertion that McMillan had demonstrated at his home.

whose views of this matter are not in agreement with his.