**AVALON RESIDENTIAL CARE HOMES, INC., Plaintiff,**

v.

**CITY OF DALLAS, Defendant.**

**No. Civ.A. 3:99–CV–2141P.**

United States District Court, N.D. Texas, Dallas Division.

Dec. 18, 2000.

Michael Maury Daniel, Laura Beth Besshara, Law Offices of Michael M. Daniel, Dallas, TX, for plaintiffs.

Christopher David Bowers, Paul A. Fletcher, Dallas City Attorney's Office, Dallas, TX, Jeanie M. Worden, Deputy Chief, Ellen M. Bowden, Trial Attorney, Housing and Civil Enforcement Section, Civil Rights Division, Department of Justice, Washington, DC, for defendants.

## MEMORANDUM OPINION AND ORDER

SOLIS, District Judge.

Now before the Court are the following:

1. Defendant City of Dallas' Motion for Summary Judgment and Brief in Support, filed on August 24, 2000;

2. Plaintiffs' Response in Opposition to Defendant's Motion for Summary Judgment and Brief in Support, filed on September 18, 2000;

3. Defendants' Reply Brief to Plaintiffs' Response to Defendant's Motion for Summary Judgment, filed on October 3, 2000;

4. Plaintiff Avalon Residential Care Homes, Inc.'s Motion for Partial Summary Judgment and Brief in Support, filed on August 24, 2000;

5. Defendant's Response to Plaintiff's Motion for Partial Summary Judgment and Brief in Support, filed on September 18, 2000;

6. Plaintiff's Reply Brief to Defendant's Response to Plaintiff's Motion for Partial Summary Judgment, filed on October 3, 2000; and

7. Brief of the United States as Amicus Curiae in Support of Plaintiff's Opposition to Defendant's Motion for Summary Judgment, filed on November 9, 2000.

For the reasons set forth below, the Court is of the opinion that Defendant's motion for summary judgment should be GRANTED in part and DENIED in part, and Plaintiff's motion for partial summary judgment should be DENIED.

## BACKGROUND

This is an action brought under the Fair Housing Act and the Equal Protection Clause of the Fourteenth Amendment. Since July 1997, Plaintiff Avalon Residential Care Homes, Inc. has operated a handicapped group home ("the Glendora home") for predominately elderly persons with Alzheimer's disease or a related dementia. Def.App. at 305. The Glendora home provides housing and essential services, such as preparing and serving meals, and assisting residents with bathing and dressing. Def.App. at 304. At this time,

Avalon cares for eight residents and is staffed on a twenty-four hour basis by full-time care givers. Def.App. at 291–92. The Glendora home operates out of a single family home located at 7315 Glendora, Dallas, Texas, in an area zoned for single family residences. Def.App. at 272.

The City alleges that the Glendora home, in its current location, violates Section 51A–4.209(b)(3.1) of the Dallas City Code, as modified by Ordinance Nos. 21044.[1] Ordinance No. 21044 created a new "residential use" for *non-family* groups, known as "handicapped group dwelling units." Def.App. at 91–110. Of course, a "family" may locate as a matter of right in all residential, central area, mixed use, and agricultural districts in the City, without regard to handicapped status. Def.App. at 643, 647.

A "family" is defined as "individuals living together as a single housekeeping unit in which not more than four individuals are unrelated to the head of the household by blood, marriage, or adoption." Def.App. at 647. In other words, five or fewer unrelated persons, handicapped or non-handicapped, living together in a single residence constitutes a family.

In 1997, at the time the Glendora home began operations, a "handicapped group dwelling unit" was defined as a single dwelling unit that is the domicile of eight or fewer handicapped persons who are not a "family" and who are living together as a single housekeeping unit. The ordinance further provides that up to two supervisory personnel may reside in the unit as long as the total number of residents does not exceed eight. Def.App. at 107.

A handicapped group dwelling may locate by right in all single family, duplex, townhouse, clustered housing, multi-family 1 and 2, manufactured home, general office, mixed use 1, central area, and agricultural districts in the City as long as it is located at least 1000 feet from all other handicapped group dwelling units and group residential facilities. Def.App. at 107–08. To obtain an exemption from the spacing requirement, a dwelling must obtain a "specific use permit." *Id.*

A "specific use permit" ("SUP") is a means to develop "certain uses in a manner in which the specific use will be compatible with adjacent property and consistent with the character of the neighborhood." Def.App. at 35. A SUP application must be filed with the City of Dallas, and the City Council evaluates each application "as to its probable effect on the adjacent property and the community welfare and may be approved or denied as the findings indicate appropriate." Def.App. at 35.

When the Glendora home began operations, it did not have the requisite SUP to operate a handicapped group dwelling unit within a 1000 feet of two pre-existing group homes—one within 400 feet and the other within 900 feet.[2] After operating the handicapped group dwelling for nearly a year in violation of the Dallas zoning regulations,[3] Plaintiff filed an application for a SUP on June 9, 1998, to obtain a variance to the 1000–foot spacing requirement. Def.App. at 236.

The permitting process began with an independent review by the City's zoning

---

1. Chapters 51 and 51A are collectively known as the Dallas Development Code, a subpart of the Dallas City Code. Ordinances passed by the City Council amend the Dallas City Code. Def.Br. at 4.

2. Prior to the opening of the Glendora home in July 1997, a handicapped group dwelling unit was located at 7615 Meadow Road—approximately 364 feet from the Glendora home—and another was located at 7246 Mimosa Lane—approximately 856 feet from the

Glendora home. Def.App. at 139–41. Neither the 7615 Meadow Road unit nor the 7246 Mimosa Lane unit has a SUP to operate a handicapped group home. Plf.Resp. at 17.

3. Plaintiff received eleven (11) municipal court citations from November 5, 1997 to February 3, 1998, for operating a handicap unit in violation of the 1000–foot spacing requirement of another unit pursuant to 51A–4.209(3.1)(B). Plf.App. at 13–23.

staff. The staff assessed the propriety of a SUP for the Glendora home and concluded that the SUP application should be approved. In addition, as required by state law, notice of the SUP application was sent to all property owners within 200 feet of the property proposed for re-zoning. Tex.Loc. Gov't Code § 211.006(d) (Vernon 1999). Sixteen of the twenty-two persons owning property within 200 feet of the Glendora home sent replies opposing the application. App. at 132; Def.Br. at 15. The sixteen neighbors opposing the SUP owned approximately 76 percent of the property within 200 feet of the Glendora home. *Id.*

On August 6, 1998, the Dallas zoning commission, known as the City Plan Commission ("Commission"), held a public hearing on Avalon's SUP application. Def. Br. at 15. Eight of Avalon's neighbors attended the hearing and spoke in opposition to the application. A representative of Avalon spoke in favor of the application. The Commission considered the testimony as well as the recommendation of the city zoning staff. After debating the merits, the Commissioners concluded that the application did not meet the criteria to obtain a SUP.[4] The Commission voted 13–1 to recommend denial of the application. Defendant then appealed the Commission's recommendation of denial to the Dallas City Council.

On September 23, 1998, the City Council held a public hearing on Avalon's SUP application. After the City Council heard much of the same testimony presented to the City Plan Commission, the Council voted 12–1 to deny the application. The City Council agreed with the Commission's conclusion that the application did not meet the criteria to obtain a SUP.

In 1999, Plaintiff also found itself in violation of the City's occupancy restriction for handicapped group dwelling units. When Avalon began operations at the Glendora home in July 1997, the City Code allowed eight handicapped persons to reside in a unit. On May 26, 1999, the City Code was modified to permit no more than six handicapped persons to reside in a handicapped group dwelling unit.[5] As before, the ordinance retained the provision that up to two supervisory personnel may reside in the unit as long as the total number of residents does not exceed eight.

On September 21, 1999, Plaintiff filed the current lawsuit, alleging that the City of Dallas violated the Fair Housing Act and the Equal Protection clause of the Fourteenth Amendment. Specifically, Plaintiff asserts three claims: (1) the ordinance is discriminatory as applied because it violates 42 U.S.C. §§ 3604(f)(1) by making housing unavailable to handicapped persons because of their handicapped status; (2) the ordinance is discriminatory as applied because the City refused to make a reasonable accommodation in City zoning rules; and (3) the ordinance violates the Equal Protection clause of the Fourteenth Amendment by discriminating against handicapped persons without a rational basis for the discrimination.

In its current motion, Defendant moves for summary judgment on all of Plaintiff's causes of action as well as on its counterclaims for injunctive relief and civil penal-

---

4. Section 51A–4.219(a)(3) of the Dallas City Code further provides that the City Council shall not grant an SUP unless it finds that the proposed use will:

　(A) complement or be compatible with the surrounding uses and community facilities;

　(B) contribute to, enhance, or promote the welfare of the area of request and adjacent properties;

　(C) not be detrimental to the public health, safety, or general welfare; and

　(D) conform in all other respects to all applicable zoning regulations and standards.

5. The City Council passed Ordinance No. 23897 revising the definition of a handicapped group dwelling unit to make it consistent with the Texas Community Homes for Disabled Persons Location Act—a state law setting the minimum number of handicapped persons the City must allow in handicapped group homes. See Tex. Human Res.Code ch. 123 (Vernon Supp.2000); Plf.Br. at 28.

ties. In its cross-motion, Plaintiff moves for partial summary judgment on Defendant's claim that Avalon has operated and continues to operate in violation of the City's zoning regulations.

## DISCUSSION

### A. SUMMARY JUDGMENT STANDARD

Summary judgment shall be rendered when the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). All evidence and the reasonable inferences to be drawn therefrom must be viewed in the light most favorable to the party opposing the motion. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). The moving party bears the burden of informing the district court of the basis for its belief that there is an absence of a genuine issue for trial, and of identifying those portions of the record that demonstrate such an absence. *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548.

Once the moving party has made an initial showing, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The party defending against the motion for summary judgment cannot defeat the motion unless he provides specific facts that show the case presents a genuine issue of material fact, such that a reasonable jury might return a verdict in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Mere assertions of a factual dispute unsupported by probative evidence will not prevent summary judgment. *Id.* at 248–50, 106 S.Ct. 2505; *Abbott v. Equity Group, Inc.*, 2 F.3d 613, 619 (5th Cir.1993). In other words, conclusory statements, speculation and unsubstantiated assertions will not suffice to defeat a motion for summary judgment. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1429 (5th Cir.1996) (en banc). If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to is case, and on which he bears the burden of proof at trial, summary judgment must be granted. *Celotex*, 477 U.S. at 322–23, 106 S.Ct. 2548.

Finally, the Court has no duty to search the record for triable issues. *Guarino v. Brookfield Township Trustees*, 980 F.2d 399, 403 (6th Cir.1992). The Court need only rely on the portions of submitted documents to which the nonmoving party directs. *Id.*

### B. DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

#### 1. Fair Housing Act Claims

The Fair Housing Act [6] makes it unlawful to discriminate in the sale or rental, or otherwise make unavailable or deny housing to any prospective buyer or renter because of a handicap of that individual, of a person associated with that individual, or of a resident or potential resident. 42 U.S.C. § 3604(f)(1) (1994 & Supp.2000).[7]

---

6. Congress passed the federal Fair Housing Act ("FHA") as Title VIII of the Civil Rights Act of 1968 to prohibit housing discrimination. In 1988, Congress passed the Fair Housing Amendments Act ("FHAA"), which expanded the coverage of the FHA to include people with disabilities. *See* 42 U.S.C. §§ 3602(h), 3604 (1995 & Supp.2000).

7. 42 U.S.C. § 3604(f)(1) provides, in relevant part:

it shall be unlawful to discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of:
(A) that buyer or renter;

Discrimination is defined as "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such persons equal opportunity to use and enjoy a dwelling." *Id.* § 3604(f)(3)(B).

■ Three theories of liability exist to establish an FHA violation: (1) disparate treatment (or intentional discrimination); (2) disparate impact (or discriminatory effect); and (3) a failure of a municipality to make a reasonable accommodation. *Gamble v. City of Escondido,* 104 F.3d 300, 304–05 (9th Cir.1997); *Alliance for the Mentally Ill v. City of Naperville,* 923 F.Supp. 1057, 1069 (N.D.Ill.1996); *Robinson v. City of Friendswood,* 890 F.Supp. 616, 622 (S.D.Tex.1995). Plaintiff asserts all three theories of liability in this case.

■ Plaintiff claims that Defendant has violated the FHA, as amended, by denying housing to persons on the basis of handicap. Specifically, Avalon alleges that the City has acted with "purposeful discrimination against the handicapped" by imposing an occupancy restriction as well as a dispersal requirement and such actions have produced discriminatory effects against Plaintiff. Plf.Br. at 16.

Plaintiff has not attempted to show intentional discrimination by direct evidence. Rather, Plaintiff has attempted to show that discriminatory purpose was a motivating factor by proving that the Defendant's action "actually or predictably" resulted in disparate impact discrimination. *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 266, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977); *Oxford House, Inc. v. Town of Babylon,* 819 F.Supp. 1179, 1182–83 (E.D.N.Y.1993). Namely, Plaintiff argues that the denial of Avalon's request for a SUP resulted in a discriminatory effect.

> (B) a person residing in or intending to reside in that dwelling after it is so sold, rented, or made available; or
>
> (C) any person associated with that buyer or renter.

Defendant responds that the disputed zoning ordinance allows more unrelated handicapped residents to occupy a dwelling in a single family district than unrelated non-handicapped residents. Section 51A–4.209(b)(3.1)(A) allows six unrelated, handicapped persons and two supervisory personnel to reside in a single family home. Only five unrelated, non-handicapped persons may live in that same residence under the City Code.[8] The effect of the increased occupancy limit is to allow unrelated, handicapped persons to live in greater numbers in a single family district as is often necessary for economic reasons. *Elderhaven, Inc. v. City of Lubbock,* 98 F.3d 175, 178 (5th Cir.1996). Furthermore, other residential uses, such as foster homes, convents, and monasteries, must obtain a SUP to locate in a single family district. Plf. App. at 290–94. Under the current regulatory scheme of uses within the single family residential zone, handicapped persons have the same rights to choose where they want to live as non-handicapped persons.

To balance the increased number of unrelated individuals residing in a home, the City enacted a spacing requirement providing that a handicapped group dwelling unit must be at least 1000 feet from an existing handicapped group dwelling unit or group residential facility. Defendant argues that the ordinance does not discriminate on the basis of handicap, but instead is aimed at large groups of unrelated persons living together. Zoning regulations that differentiate on the basis of relation have long been recognized as a constitutional means of protecting single family neighborhoods from households composed of unrelated individuals. *Village of Belle Terre v. Boraas,* 416 U.S. 1, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974). The

8. Five unrelated individuals, handicapped or non-handicapped, may live together in a single family home under the definition of "family." Six unrelated, non-handicapped persons could not live in a single family home under any circumstances.

City's zoning policies grant handicapped persons the option to live in greater numbers than non-handicapped individuals in single family districts. However, such high-occupancy homes must be a certain distance from one another. A spacing requirement prevents the problems associated with a high concentration of unrelated people—handicapped or not—in close proximity. Such a policy does not make Section 51A–4.209(b)(3.1) discriminatory on its face or as applied so as to make housing unavailable on the basis of handicap.

In addition, the City has established a framework by which handicapped group homes may apply for exceptions to the use restrictions associated with handicapped group homes. In the past ten years, Avalon is only the second handicapped group home to apply for a variance to Section 51A–4.209(b)(3.1), and the only handicapped group home to be denied such a variance.[9] Indeed, we note that handicapped group homes are widely found in Dallas.

Of course, the Court recognizes that the City Ordinance will affect the ability of some unrelated, handicapped persons to choose where they want to live insofar as fifty unrelated, handicapped persons cannot live together in a single family home. But neither can fifty unrelated, non-handicapped persons. Nor should they. There must be certain limits on how people can use property. That is the nature of zoning laws. Plaintiff argues that no non-handicapped person will be denied a dwelling unit by the City's actions. This is simply not the case. The City's zoning laws restrict the number of unrelated people who can occupy a residence, whether a person is handicapped or not.

Finally, we do not focus on whether the ordinance should allow six or eight or twenty residents to occupy a handicapped group home. Indeed, Avalon has never argued, much less proven, that eight is the critical number of residents needed to make feasible the type of alternative living arrangements that the Fair Housing Act was designed to encourage.[10] *Elderhaven,* 98 F.3d at 179. Moreover, we do not address whether an appropriate dispersal requirement is 1000 feet, 600 feet, or 200 feet. Instead, these questions are better addressed by the City on a case-by-case basis. For this reason, we inquire into the City's willingness to interpret its zoning laws in a flexible manner so as to meet the needs of handicapped individuals. *Id.* at 178–79. In other words, does the City ordinance provide handicapped persons a reasonable accommodation?

■ Plaintiff claims that the City's denial of Avalon's application for a SUP constitutes a refusal by the City to make a reasonable accommodation for the handicapped in its zoning policies. Under the FHAA, discrimination on the basis of handicap includes a "refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3). To determine whether a City's ordinance con-

---

9. On January 17, 1992, the Autistic Treatment Center, Inc. filed an application for a SUP for five handicapped dwelling units located on three lots within 1000 feet of each other. On March 25, 1992, the Dallas City Council granted the application and passed Ordinance No. 21242, which established SUP No. 1102. Def.App. at 117–21, 133.

10. Avalon has argued, however, that it is not in violation of Section 51A–4.209(b)(3.1) because it is not operating within 1000 feet of a pre-existing handicapped group home or group residential facility. If such is the case,

then the Glendora home would fall under Section 51A–4.704 of the Dallas City Code governing "nonconforming uses." "Nonconforming uses" are uses that are lawfully established, but could not be established today. Def.Resp.Br. to Amicus Curiae Br. at 1–2. Therefore, if the Glendora home was lawfully established as of May 26, 1999, the day the City lowered the occupancy restriction for handicapped group dwelling units from eight to six, the home could continue to operate lawfully with more than six residents.

stitutes a reasonable accommodation of the housing needs of the disabled, the courts must consider how the ordinance operates under the City's overall zoning law. *Elderhaven*, 98 F.3d at 178. Furthermore, the plaintiff bears the burden of proof on the question of reasonableness by a preponderance of the evidence. *Id.*

Plaintiff has provided some evidence that the City Plan Commission and Dallas City Council did not approve a SUP when such an accommodation may have been reasonable and necessary to afford handicapped persons equal opportunity to use and enjoy a dwelling. Plf.App. at 4, 29–31. Specifically, the evidence suggests that the Commissioners and City Council members relied on generalized perceptions about disabilities and unsubstantiated speculations about threats to health, safety, and community welfare. Def.App. at 161–62; 184–196; 219–231.

Furthermore, both the City Plan Commission and the Dallas City Council focused on the commercial status of the Glendora group home, though Avalon is a non-profit corporation. Def.App. at 179–80; 183–84; 211; 217–18; 224–25; 228–29. The nature of group home living for the handicapped often requires alternative living arrangements to effectuate the purpose of the FHA. *Elderhaven*, 98 F.3d at 179. The disabled are not able to live safely and independently without organized, and sometimes commercial group homes.[11] *Groome Resources Ltd. v. Parish of Jefferson*, 234 F.3d 192, 202 (5th Cir.2000). The fact that the Glendora home is a business should not be the basis for denying an accommodation when reasonable and necessary.

In addition, the Commissioners and City Council members, in their discussions on whether to grant or deny the SUP, focus on the allegation that the Glendora home operated in violation of the spacing requirement for nearly a year before it sought a variance to the zoning requirement. However, as Plaintiff has shown, a handicapped group home wanting to locate in the City of Dallas has no means by which to identify existing group homes unless those homes have obtained a license from the State of Texas,[12] which Defendant claims is not required for purposes of zoning laws, or have been granted a SUP, which a group home does not need unless they are within 1000 feet of another handicapped group dwelling or group residential facility. In other words, handicapped group homes, such as the Glendora home, can make every effort to comply with the zoning regulations and still find themselves in violation of the use restrictions due to an apparent flaw in the City's zoning plan.

Moreover, the City states that the use regulations applied to handicapped group dwelling units are intended to reasonably accommodate handicapped persons seeking to permanently reside together. However, a neutral regulation may not always provide the appropriate accommodation in every circumstance. A City must be willing to adjust to the particular circumstances of each case and interpret its regulations flexibly so as to reasonably accommodate handicapped persons in its zoning decisions. *Elderhaven*, 98 F.3d at 178–79. The City's ordinance sets a framework for decision-making, but that process fails if those decisions are based on generalized stereotypes or political pressure.

For the reasons stated above, the Court concludes that Plaintiff has not raised a genuine issue of material fact on its Fair

---

11. Other circuits have also recognized that commercial group homes may be the only way for disabled individuals to live in a residential community. *See Hovsons, Inc. v. Township of Brick*, 89 F.3d 1096, 1105 (3d Cir.1996); *Smith & Lee Assocs., Inc. v. City of Taylor, Mich.*, 13 F.3d 920, 931 (6th Cir. 1993).

12. A handicapped group home wanting to locate in Dallas cannot learn of a *pending* application for a state license unless they have the specific address of the home applying for such license.

Housing claim that the ordinance and application thereof make housing unavailable on the basis of handicap, and Defendant is thus granted summary judgment on Plaintiff's disparate treatment and disparate impact claims. The Court does find, however, that there is a triable issue of fact as to whether Defendant discriminated against the handicapped in refusing to make reasonable accommodations in the City's zoning rules when such accommodations may be necessary to afford handicapped persons equal opportunity to use and enjoy a dwelling. ·

## 2. Equal Protection Claim

 Plaintiff claims that the City's zoning ordinance violates its Fourteenth Amendment right to equal protection of the laws. The equal protection clause essentially requires that all persons similarly situated be treated alike. *Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985); *Mahone v. Addicks Utility Dist. of Harris Co.*, 836 F.2d 921, 932 (5th Cir.1988). When a statute classifies on the basis of handicap, the general rule for testing official action is that the challenged action is presumed to be valid and must be sustained if the classification drawn by the action is "rationally related to a legitimate governmental purpose."[13] *Cleburne*, 473 U.S. at 439–40, 446, 105 S.Ct. 3249; *Howard v. City of Garland*, 917 F.2d 898, 899 (1990). The rational relationship test is applied because handicapped persons are not a protected class for purposes of equal protection under the Fourteenth Amendment. *Cleburne*, 473 U.S. at 446, 105 S.Ct. 3249.

In *Cleburne*, the U.S. Supreme Court made the following inquiry: if the potential residents of the group home were not disabled, but the home was the same in all other respects, would its use be permitted under the city's zoning ordinance? *Cleburne*, 473 U.S. at 449, 105 S.Ct. 3249. Applied in this case, the Court finds that six unrelated, non-handicapped persons cannot occupy the same home. Other residential uses, such as convents, monasteries, foster homes, halfway houses, college dormitories, fraternity and sorority houses, duplexes, group residential facilities, manufactured home parks and subdivisions, campgrounds, multifamily units, residential hotels, and retirement housing also cannot freely occupy the identical structure. In fact, of these uses, convents, monasteries, and foster homes are the only uses that may locate in a single family district and only after obtaining a SUP. Plf.App. at 290–94. The uses cited by Plaintiff are either dissimilar to handicapped group homes or regulated to approximately the same degree for substantially the same purposes.

Plaintiff alleges that the City's denial of the SUP was based on irrational prejudice against the class of persons to occupy the residence. Again, we note that handicapped group homes are widely allowed and the ordinance requires a SUP for handicapped group homes where more than five handicapped people are served and then only if the operation is in a single family district and the home is located within 1000 feet of another group home or residential facility. Plaintiff has presented no evidence that the specific requirements of the zoning ordinance for the SUP are irrational or driven by invidious discrimination.

Plaintiff also argues that the home would be subject to an occupancy restriction and spacing requirement no matter where the home is located. This is not the case. Plaintiff could locate in any other

---

**13.** Handicapped persons are not a protected class for purposes of equal protection under the Fourteenth Amendment. *Cleburne*, 473 U.S. at 446, 105 S.Ct. 3249. This general rule does not apply to certain protected classifications or when the classification impinges on personal rights protected by the Constitution. *Mahone*, 836 F.2d at 933 n. 12 (citing *Cleburne*, 473 U.S. at 440, 105 S.Ct. 3249). With classifications of this sort, the state action is subject to strict scrutiny. *Id.*

district besides a single family district as a group residential facility. Under the designation of group residential facility, Avalon could house an unlimited number of handicapped persons and could seek a variance to the spacing requirement.[14]

The City's actions satisfy rational basis scrutiny. Zoning concerns are recognized as legitimate governmental goals. *Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 386–88, 47 S.Ct. 114, 71 L.Ed. 303 (1926). The City's ordinance and its actions to enforce it were rationally related to achieving its goals. Accordingly, Plaintiff has not presented a genuine issue of material fact and Defendant is thus granted judgment as a matter of law on Plaintiff's Equal Protection claim.

### 3. Defendant's Counterclaims

■ Defendant moves for summary judgment on its counterclaim that Plaintiff is in violation of Section 51A–4.209(b)(3.1) and Defendant is therefore entitled to a permanent injunction and civil penalties. Specifically, the City seeks to enjoin Avalon from operating a handicapped group dwelling unit in violation of the City's zoning regulations and also seeks civil penalties of $1000 per day since September 23, 1997, the day Plaintiff first received notice of its violation of the City's ordinance.

Having examined all of the evidence submitted by the parties in the light most favorable to the Plaintiff, the Court finds that Plaintiff has presented a genuine issue of material fact as to whether Avalon is or was in violation of the City's zoning regulations. With respect to the home at 7246 Mimosa Lane, the evidence suggests that the City has never been able to determine the number of residents living at that location though it has repeatedly attempted to inspect the premises with little if any cooperation from the owner of the property.

Assuming *arguendo* that at some point more than five unrelated persons lived at the Mimosa residence, then the home would be operating illegally under state law. Though the City argues that the illegal status of a group home is irrelevant for purposes of local zoning regulations, Plf.App. at 58–59, the obvious question is how one seeking to establish a handicapped group home, such as Avalon, can determine the location of other handicapped group homes or group residential facilities within 1000 feet if such homes are operating illegally, are not licensed, and have not obtained a SUP. The City has never addressed this issue.

With respect to the residence located at 7615 Meadow Road, the summary judgment evidence indicates that the home may have been a handicapped group home for some period of time. From August 1, 1996, to January 15, 1999, the manager and/or owner of the facility, Nola Demunbrun, states that "between one and six unrelated persons resided at that location, including a caregiver. Most of the time, between five and six persons...." Def. App. at 136. However, in a letter to the Texas Department of Human Services ("TDHS"), dated August 25, 1998, Ms. Demunbrun informs the TDHS that the Meadow Road home only had three residents and that she would contact the TDHS before renting to a fourth person. Plf.App. at 172. No evidence in the record suggests that Ms. Demunbrun ever contacted the TDHS advising of additional residents. Furthermore, the information

---

14. A group residential facility may not locate in single family, duplex, office retail, commercial/industrial, and multiple commercial districts. It may, however, locate by right in clustered housing, multifamily, central area, and mixed use districts in the City as long as it is located at least 1000 feet from all other handicapped group dwelling units and group residential facilities. Def.App. at 107–08.

Like a handicapped group dwelling, a group residential facility may seek a SUP to be exempted from the spacing requirement. *Id.* An important distinction between a handicapped group dwelling unit and a group residential facility, for purposes of this case, is that a handicapped group dwelling may locate in a single family district and a group residential facility may not.

844

obtained by the TDHS from January 2, 1997, to August 25, 1998, indicates that the Meadow Road location has not housed over five residents at any one time. Plf.App. at 143, 147, 151–52, 172–75, 178. Thus, because the evidence is conflicting, and viewing such evidence in favor of the Plaintiff, the Court finds that there is a question as to when the Meadow Road location qualified and perhaps ceased to qualify as a handicapped group dwelling.

Accordingly, Plaintiff has raised a triable issue of fact on Defendant's counterclaims, and Defendant is thus denied summary judgment on its claims of injunctive relief and civil penalties.

## C. PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

 In its motion, Plaintiff moves for judgment as a matter of law with respect to Defendant's claim that the Glendora home was and is in violation of the 1000–foot spacing requirement by operating within 1000 feet of two other pre-existing handicapped group homes. Plaintiff contends that Defendant has provided no evidence that the other two homes are in fact handicapped group homes. Defendant responds by arguing that Plaintiff has waived such a claim because it did not raise this claim during previous administrative proceedings. Defendant offers no case law that a claim not raised in administrative proceedings is thus waived in subsequent judicial proceedings. In addition, Defendant offers no evidence that the other two homes are in fact handicapped group homes. Defendant merely argues that Plaintiff's failure to question the status of the other two homes during the City Plan Commission hearing and the City Council hearing amounts to a failure to exhaust all administrative remedies available.

Based on the arguments before the Court, and with no case law on point, the Court finds that Plaintiff has not waived its claim challenging the character of the two allegedly handicapped group homes

within 1000 feet of the Glendora home. Furthermore, the Court finds that there is a genuine fact issue as to the characterization of these other two homes and whether the Glendora home is in fact in violation of Section 51A–4.209(b)(3.1). Accordingly, Plaintiff's Motion for Partial Summary Judgment is denied.

## CONCLUSION

Upon thorough review of both parties' arguments, the summary judgment evidence on file, and applicable law, the Court finds that Defendant's Motion for Summary Judgment is GRANTED in part and DENIED in part. In addition, Plaintiff's Motion for Partial Summary Judgment is DENIED.

**So Ordered.**