**UNITED STATES of America;
Clementine Michael
Plaintiff**

v.

**CITY OF JACKSON, MISSISSIPPI
Defendant**

No. CIV.A. 3:96–CV–419WS.

United States District Court,
S.D. Mississippi,
Jackson Division.

Oct. 23, 2002.

Mitzi Dease Paige, U.S. Attorney's Office, Jackson, MS, Seth Rosenthal, U.S. Department of Justice—Civil Rights Division, Housing & Civil Enforcement Section, Washington, DC, for United States of America, plaintiff.

Hugh W. Tedder, Jr., Daniel, Coker, Horton & Bell, Jackson, MS, Sarah A. O'Reilly–Evans, Sarah A. O'Reilly–Evans, Attorney, Jackson, MS, for City of Jackson, Mississippi, defendant.

## MEMORANDUM OPINION AND ORDER

WINGATE, District Judge.

Before this court is a motion filed by the United States of America (hereinafter "United States"), asking this court to hold the defendant City of Jackson, Mississippi (hereinafter "the City"), in civil contempt and to grant to the United States appropriate supplemental relief. The United States charges that the City has violated a permanent injunction ordered by this court in a Consent Decree, dated December 18, 1997, relative to the "reasonable accommodation" provision of the Fair Housing Amendments Act of 1988 ("FHAA"), Title 42 U.S.C. § 3604(f)(3)(B). According to the United States, the City violated the Consent Decree's "prohibitive injunction" which ordered the City and its employees not to discriminate in its housing decisions relative to handicapped persons, when on

September 6, 2000, and November 7, 2000, the City denied an application by Christians in Action (hereinafter "CIA") for a use permit under the City's Zoning Ordinance to locate a "group home for the handicapped" in the City's suburban Brookhollow Place subdivision.

The United States, arguing that the essential facts undergirding its motion are not in dispute and that the applicable law favors its motion, now campaigns for a grant of summary judgment pursuant to Rule 56(a)[1] and (c).[2] The United States principally relies upon an extensive administrative record of the actions of the City's Planning Board and the City Council on CIA's application for the use permit in question.

The City opposes the United States' request for summary judgment. Agreeing that the material facts are not in dispute, the City, nevertheless, argues that since it eventually granted CIA the permit it sought, it should not be held in civil contempt. Additionally, says the City, at all times it acted in good faith.

This court is not impressed by the City's defenses; instead, this court is persuaded to grant the United States' motion to hold the City in civil contempt based upon the September 6, 2000, denial by the City of an application by CIA for a use permit under the City's Zoning Ordinance as a "group

---

1. Rule 56(a), Federal Rules of Civil Procedure, provides:

   (a) **For Claimant.** A party seeking to recover upon a claim, counterclaim, or cross-claim or to obtain a declaratory judgment may, at any time after the expiration of 20 days from the commencement of the action or after service of a motion for summary judgment by the adverse party, move with or without supporting affidavits for a summary judgment in the party's favor upon all or any part thereof.

2. Rule 56(c), Federal Rules of Civil Procedure, provides in pertinent part:

   (c) **Motion and Proceedings Thereon,** The motion shall be served at least 10 days before the time fixed for the hearing. The adverse party prior to the day of hearing may serve opposing affidavits. The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

home for the handicapped." CIA had sought that permit as a "reasonable accommodation" to the single-family zoning applicable to residences in the City's suburban Brookhollow Place subdivision, the neighborhood to which it sought to relocate its residential shelter for abused and neglected children, most of whom CIA had contended were "handicapped" within the meaning of the FHAA. Hereinafter this court sets out in some detail the basis for its ruling.[3]

## FINDINGS OF FACT

### Initial Liability Decision and Consent Decree

In 1996, the United States brought suit against the City of Jackson to enforce the provisions of the FHAA, Title 42 U.S.C. §§ 3601–3619. The United States alleged that the City had violated § 804(f)(3)(B) of the FHAA by refusing to "make reasonable accommodations" in its zoning "policies * * * which may [have been] necessary to afford [handicapped] persons equal opportunity to use and enjoy a dwelling." Title 42 U.S.C. § 3604(f)(3)(B). The United States further contended that the City had violated § 804(f)(3)(B) by refusing to authorize the operation of a small, non-profit personal care home ("Cypress Cove") for up to twelve (12) elderly women in the early-to-moderate stages of Alzheimer's Disease in an area of the City zoned R–1 for single-family residential use. On October 14, 1997, this court entered a Memorandum Opinion and Order ("Mem. Op."), granting the United States' Motion for Partial Summary Judgment as to Liability and concluding that the City had violated the FHAA by refusing to provide the requested accommodation. (Mem. Op. at 43–44).

Thereafter, the United States and the City agreed to a Consent Decree which this court approved and entered on December 18, 1997. That Decree enjoined the City and its employees from discriminating in housing on the basis of handicap. "Discriminate" was defined to include "any refusal to make accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford a handicapped person equal opportunity to use and enjoy a dwelling." *Id.* at 3–4. The Decree also provided for "affirmative injunctive relief." *Id.* at 4. That relief required the City to amend its Zoning Ordinance to allow "group homes for the handicapped" and "personal care facilities" of up to six residents plus two staff as of right in areas zoned R–1 residential and to permit such homes with between seven and twelve residents as a "permitted use" in such areas upon application and approval of such a use permit. *Id.* at 4–5. In addition, the Decree mandated that the City apply the FHAA's "reasonable accommodations" standard in ruling on an application for such a use permit. *Id.* at 5. Finally, the Consent Decree provided remedies for noncompliance, permitting the United States to move for "any remedy authorized by law or equity, including but not limited to an order requiring performance of an act, deeming an act to have

---

**3.** The motion at issue was argued to the court on September 20, 2001, whereupon this court issued a bench ruling granting the United States' motion for summary judgment and finding the City in civil contempt for its initial denial of the permit on September 6, 2000, and its unreasonable delay in granting the permit until only after the United States had instituted enforcement proceedings against it. Then, on September 27, 2001, this court issued a truncated, written opinion to be followed at a later date by a lengthier, more comprehensive one. Since the court found for the United States on its motion for contempt, the court allowed the United States additional time to submit its documentation on the issue of damages and decided to delay issuing this written comprehensive decision until after the court had decided the matter of damages.

been performed or awarding any damages, costs and/or attorneys' fees which may be occasioned by the City's violation of this Consent Decree." *Id.* at 9.

**The City's Amended Zoning Ordinance**

In due time, the City amended its Zoning Ordinance to comply with the Consent Decree. The amended Ordinance provides that "group homes for the handicapped" housing six or fewer residents, excluding staff, are to be treated the same as a single-family residential dwelling—as of right as a permitted use—in an R–1 Single–Family Residential District. § 602.02.1.[4] Moreover, such group homes housing between seven and twelve residents, excluding staff, are permitted uses in such a district, provided they are established in accordance with the provisions of the Ordinance. *Id.,* § 602.02.3.4. As with other uses which may be undertaken if a use permit is obtained, such uses are those "which are generally compatible with the land uses permitted in a zoning district, but due to their unique characteristics, require individual review to ensure the appropriateness and compatibility of the use on any particular site." *Id.,* § 1701.01–A.

The Ordinance states in general that, when ruling upon a use permit, the City Council shall consider six factors, including: (1) compatibility with the character of development in the vicinity relative to density, bulk and intensity of structures, parking, and other uses; (2) detriment to the continued use, value, or development of properties in the vicinity; (3) adverse effect on vehicular or pedestrian traffic in the vicinity; (4) impact on existing or proposed public services and facilities; (5) harmony with the Comprehensive Plan; and (6) possible hazard, detriment, or disturbance to present surrounding land uses due to noises, glare, smoke, dust, odor, fumes, water pollution, vibration, electrical interference, or other nuisances." *Id.,* § 1701.02–A. Notwithstanding these general standards, the Ordinance specifically mandates compliance with the FHAA. Indeed, when considering an application for a use permit for group homes for the handicapped, the Ordinance dictates that the City shall "comply with the provisions of 42 U.S.C. Section 3604(f)(3)(B)." *Id.,* § 602.02.3.

**The Emergency Shelter Operated By CIA**

CIA is a non-profit charitable corporation organized under the laws of the State of Mississippi. Operating under a license from the Mississippi Department of Human Services, CIA provides an emergency residential shelter for abused and neglected children ranging in age from infancy to twelve years old. Most of the children residing at the shelter are no older than five.

Sue Perry, Director of the State's Division of Family and Children Services, Department of Human Services, offered the following opinion on the public service and effectiveness of the CIA shelter:

> [The] CIA shelter has provided an invaluable service to abused and neglected children since 1977. Staff provide a safe, caring, homelike environment for vulnerable, scared, hurting children who have been removed from their home due to allegations of physical abuse, neglect, sexual abuse and/or emotional abuse.

James A. Peden, Jr., who represented CIA before the City at the Planning Board and City Council hearings on the application for the use permit, similarly emphasized the unique service provided by the CIA shelter in his statement in support of the application:

---

4. The amended Ordinance defines "Group Home for the Handicapped" in § 202.67.

When officers of the Jackson Police Department are called to a location where a child has been abandoned or nearly starved, or where a child has been burned, beaten, or sexually abused, these officers take the victimized child to the Christians in Action emergency shelter. It is the only such shelter within the City of Jackson where the Jackson Police Department can take such abused or neglected children. The Jackson Police Department works closely with Christians in Action.

Continuing his praise for the CIA shelter, Peden further described the operation of the CIA shelter as follows:

The average number of children present at any one time is seven. The children may stay at the emergency shelter for up to 45 days, until the Hinds County Youth Court and the social services agencies can arrange permanent foster care.

The emergency shelter operated by Christians in Action provides nutritious meals; appropriate bedroom, bathroom, and dining space; and a safe, clean, secure, and healthy environment.

The permanent staff of Christians in Action includes an Executive Director, live-in house parents, a full-time social worker to provide individual and group therapy, and three full-time aides. The staff personnel provide full-time supervision, and they transport the children to schools, to recreational activities, and to physicians for medical care.

**Evidence of "Handicapped" Status of the Children Served by the CIA Shelter**

At oral argument, the City conceded that the children served by CIA are "handicapped" within the meaning of the FHAA and its Zoning Ordinance. Although the City earlier balked at this conclusion, the uncontradicted evidence in the record supports that admission. For instance, in his statements offered in support of the use permit and in his appearances before both the Jackson City Council and the City's Planning Board, Peden noted that the children served by CIA:

suffer from such conditions as mental retardation, various types of psychological disorders, confinement to a wheelchair, cerebral palsy, epilepsy, and blindness. Many of the problems experienced by these children have resulted from physical abuse, mental abuse, sexual abuse, neglect, or deprivation.

Peden's observations did not stand alone; they were reinforced by the statements of Dr. John B, Jolly. Dr. Jolly is Board-certified in clinical child psychology and, as the consulting clinical psychologist for CIA, has evaluated children served by its emergency shelter for about four years. He testified before the City Planning Board that "virtually all [the children] are handicapped" within the applicable definition and that "all of them have been diagnosed with some type of mental impairment which interferes with their functioning in one or many different ways of their life."

Dr. Jolly's letter of May 24, 2000, to Janice Wilder, Executive Director of CIA, clearly describes the "handicapped" status of the CIA children:

Almost all of [the CIA] children come into the world with language disorders, learning problems, physical anomalies, and emotional/behavioral problems such as depression, anxiety, and even predispositions to addictions. * * * Those who are neglected often suffer from mental retardation, poor social skills, and academic failures.

This letter was submitted to and apparently considered by the City's Planning Board.

At the Planning Board hearing, CIA also introduced an exhibit of redacted files

of children who have resided at the emergency shelter. Significantly, those files were available to the City Council for review as part of the record before it. The documentary evidence in these files supports the conclusion stated by Dr. Jolly as to the handicapped status of the CIA children. For instance, the records in these files showed the following examples of children served:

- A 3 year-old boy who was blind, non-ambulatory, non-vocal and had cerebral palsy.
- A 4 year-old boy who uses a wheelchair and has mental retardation.
- A 12 year-old girl who has severe mental retardation, cerebral palsy, and epilepsy who had only recently "learned to feed herself with her fingers and * * * learned to hold a cup with a handle in order to drink."
- A 7 year-old boy who walks with a limp and has a speech impediment who came into custody because his home was "deplorable" and "unsafe."

### The Subject Property

The home for which CIA had sought a use permit is located at 2025 North Siwell Road, a short distance south of Highway 18 in the City's suburban Brookhollow Place subdivision, on a wooded lot of approximately 3.14 acres. The lot contains a three-bedroom, three-bath brick home of approximately 3,000 square feet, to which CIA planned to make minor additions which would not change the residential appearance of the home or the residential character of the subject property. Peden provided the following further description in his statement in support of the application:

The subject property, which has a depth of 500 feet and which is completely fenced, contains a huge back yard that would provide an ideal play area for children. The front of the subject prop-

erty is wooded, and the home can barely be seen by motorists passing the street.

The land to the west is wooded and undeveloped. The land across North Siwell Road to the east is also wooded and undeveloped. * * * Trinity Lutheran Evangelical Church is located to the North. These tracts to the west, east, and north are zoned R–1 Single–Family Residential District. The back yards of homes located on Jamestown Court, in an R–1A Single–Family Residential District, lie immediately south of the subject property. The aforementioned fence and heavy landscaping screen and buffer the subject property from those back yards.

The certified written report prepared by Joseph A, Lusteck Associates on behalf of CIA ("The Lusteck Report") also contained the following observations regarding the subject property which demonstrate the compatibility of the use proposed by CIA with the surrounding neighborhood:

15. It is interesting that the minimum lot size requirement for single-family residences in the R–1 district is only 7,500 square feet. Using this standard, an alternative future for this property could be a total of 14 residences after allowing 20% of the land area for streets. This permitted development and use would have far greater impact on neighboring properties, streets and utility infrastructure than use of the existing residence as proposed to be enlarged to accommodate 12 children.

16. Other potential uses for this property under the existing R–1 Single Family Residential District zoning include one or more churches, public parks and open spaces, public libraries, public or private schools, public utility facilities and structures to provide essential public services, home occupations

(subject to a home occupation permit), or public facilities and uses necessary for conducting the business of operating the City, County, State, and/or Federal Government. Every one of these alternatives permitted by right would have a greater impact on adjacent and nearby neighbors than the use requested by Christians in Action, Inc.

17. The City's Comprehensive Plan classifies North Siwell Road on which the property of Christians in Action, Inc. is located as a Primary Arterial. This classification of roadway is one primarily intended to accommodate large volumes of vehicular traffic and provide a correspondingly lower level of land access along its frontages. Growth of the traffic volume currently experienced along North Siwell Road is likely to occur, but not because of the use of the subject property proposed by Christians in Action.

\* \* \* \* \* \*

28. Inspection of the property confirms that the use requested is compatible with the character of development in the area relative to density, bulk, intensity of structures, parking, and other uses. The character of development in this area is single-family residential along with other uses permitted in areas with the R–1 Single–Family Residential District.

The Lusteck Report also considered whether the use proposed by CIA would meet each of the six factors to be considered by the City Council in granting a use permit under its Zoning Ordinance and concluded that it would.

## CIA's Application for A Use Permit As A Reasonable Accommodation and Its Denials by the City

On May 19, 2000, CIA applied to the City for a use permit for operation of a "group home for the handicapped" pursuant to Section 602.02.3.4 of the Zoning Ordinance. The application stated that the planned use of the property was as an "[e]mergency shelter for abused/neglected children." [5] The "Notice of Hearing" sent to surrounding property owners stated, *inter alia,* that, "Granting the requested use permit will not change [the current R–1 Single–Family Residential] zoning classification." On June 12, 2000, the Jackson City Planning Board issued a "staff report" which *"recommend[ed] approval of the Use Permit* because the *proposed use is consistent with the definition of a group home for the handicapped* as defined by

**5.** This was not the first time CIA had sought approval from the City regarding its use of the subject property as made clear by attachments to the use permit application submitted by CIA to the Planning Board. Attachment 2 is a history of the CIA's prior efforts. That history shows that in 1998, CIA briefly sought a "rezoning" of the property—a request it withdrew after retaining counsel. On May 21, 1998, it submitted an amended application, seeking a "special exemption." During the hearing before the Planning Board, CIA did not provide evidence of the handicapped status of the children it would serve and did not request a reasonable accommodation at that time. The Planning Board forwarded the application to the City Council without a recommendation. The City Council on September 2, 1998, voted to deny the requested special exception. Thereafter, CIA sought reconsideration to present evidence that children served by the CIA shelter were "handicapped" within the meaning of the FHAA and the City's amended Zoning Ordinance. Ultimately, the City concluded that CIA had to submit a *new* application if it were to consider such evidence. Thereafter, CIA did that by filing its May 19, 2000, application, which made clear that it was seeking the use permit for a residence to be used as a "group home for the handicapped" under the City's revised zoning ordinance. The motion of the United States does not contest the City's 1998 denial of the special exception but challenges only the City's denial on September 6, 2000, of the application filed by CIA in May, 2000.

6

the Jackson Zoning Ordinance and meets the criteria stated in the Staff Analysis [pertaining to such a group home]." (Emphasis supplied).

The Planning Board held an evidentiary hearing on CIA's request on June 28, 2000, at which the record upon which the City Council would ultimately base its decision was made. At that hearing, Peden emphasized that CIA sought a reasonable accommodation by applying for the use permit. Peden's statement to the Planning Board described the CIA program and the need for the housing. He placed into the record a group of photos showing the subject property; letters of support, and called a number of witnesses, including Dr. Jolly, Lusteck, and Carol Burger, President of the United Way of the Capital Area, whose testimony supported granting the permit.

Peden placed into the record the May 24, 2000, letter from Dr. Jolly explaining the "handicapped" status of the children he had evaluated. Peden also submitted examples of typical case files, with names deleted, showing examples of children who are "handicapped and disabled as a result of physical abuse, mental abuse, sexual abuse and neglect." Dr. Jolly testified at the hearing that he had evaluated CIA children over a four-year period and had concluded that "virtually all" were "handicapped" under the definition contained in the FHAA.

No evidence contradicting Dr. Jolly's testimony or the documentary records of the children was presented to the Board. Further, the City admitted at oral argument that it made no additional investigation of the "handicapped" status of the children after the September 6, 2000, denial of the permit.

During the testimony of land-use consultant Joseph Lusteck, Peden submitted Lusteck's certified report analyzing the application under the standards for a "reasonable accommodation" and the generally applicable standards for granting use permits. Lusteck testified that the proposed use met *each* of the six factors to be generally considered by the City in granting a use permit and would not have *any* adverse effect on the neighborhood or property values. On the latter point, Lusteck testified:

I have personally undertaken studies throughout Mississippi where this kind of issue has arisen and have never been able to demonstrate with empirical data that there is any causative relationship between the introduction of a facility of this type and diminution of property values. It is a myth. It is a myth in the objectors's lore. There is no truth to it.

No objective evidence in the record contradicts the factual record constructed by CIA before the Planning Board.

Still, area landowners appeared before the Planning Board to voice their opposition to the use permit. For the most part, they framed their opposition on issues not presented by the May, 2000, application (*i.e.*, rezoning) or without a factual basis for contradicting the record made by CIA on certain issues (i.e., "handicapped" status of CIA children, impact on property values) or on legally irrelevant concerns (i.e., that CIA—the provider of the housing—was a corporation with paid employees).

James Cooper, president of the Brookhollow Place Neighborhood Association, for instance, expressed his concerns that the use permit would open the community's door to businesses. He presented a petition to the Planning Board from the Association stating that the signatories were "not in agreement with the propose[d] rezoning of the property * * * from R1 to R5. For we feel that this will open the opportunity for other apartments/businesses to come into the area in which we feel will increase crime." Coo-

per added: "[A]s far as the children's home itself, no one, I don't think is opposed to this children home, *per se.* The thing that the people in this community— in the Southwest Community are concerned about is rezoning. The rezoning is the matter." He emphasized that everyone in the area "would prefer to be left alone." He also said that his group did "not want the house changed to and used as a business. A business will be the shelter's real character."

Irma Johnson, president of the Cedar Hills Neighborhood Association, echoed Cooper's comments about "rezoning": "The residents which live there, we do not want this rezoning in our neighborhood. We are a community and we want to stay a community. It is not fair to the homeowners that have purchased homes in R–1 residential. That's the issue here. Nothing else."

Another Cedar Hills resident opposed the application because CIA would have employees who would run the shelter: "Employees of this association—this corporation, are coming here. These are people [who] are getting paid * * *. They get paid. They're a business."

Despite such expressed concern about "rezoning," Jackson Planning Board staff member Mary Merck reminded the Board and the opponents at the hearing that the CIA application for a use permit is "not a rezoning request: it's a use permit." City Zoning Administrator William Hardin similarly counseled, noting, "The underlined zoning would always be R–1, correct. It does not change."

During the hearing, the Deputy City Attorney reminded the Board of the history of the Consent Decree and that "our ordinance now specifically speaks to group homes for the handicapped and that when they come before you, then you shall comply with the federal law on Fair Housing, and that means reasonable accommoda-

tion, Denials have to have a technical basis." Hardin also pointed out that the amended Zoning Ordinance allowed group homes for the handicapped "as a matter of right in all residential districts with up to six handicapped individuals. So, I mean, they don't have to be here today to have six. It's in-between seven and 12."

The City's lawyer also emphasized to the Board that the City could not simply base an approval or denial on such reasons as. " 'We want it,' or 'We don't want it,' or the neighborhoods want it or don't want it. That's not legal criteria." As for whether the children met the definition of "handicapped," she noted that the City's definition was consistent with federal law, that CIA had the burden of showing that its residents met that definition, and that CIA had presented an "expert and * * * documents" on that issue.

Thereafter, the Board voted (seven-to-four with one abstention) to recommend that the City deny the permit. The official notice of the Planning Board's recommendation simply stated. "The Board was of the opinion that granting the requested Use Permit would adversely affect the surrounding properties, and otherwise be detrimental to the public welfare." The Board made no attempt to frame the recommended denial in terms of the "reasonable accommodation" analysis previously employed by this court.

The City Council considered the recommendation at its September 6, 2000, meeting. That consideration was based "on the record" of the Planning Board, and no new evidence could be introduced. That record, as CIA's attorney reminded the Council, included evidence from Dr. Jolly showing that the CIA children were "handicapped" within the meaning of the Act and evidence from planning expert Joseph Lusteck that the application met all of the City's criteria for a use permit,

including being in harmony with the City's Comprehensive Plan, being compatible with the development in the area, and not being detrimental to other properties, and that Lusteck had testified that "there is simply no evidence that group homes like Christians in Action emergency shelter adversely affect property values."

Cooper, representing the Brookhollow Place Neighborhood Association, again spoke against the application, as before, emphasizing that the homeowners "basically would prefer to be left alone as a secluded neighborhood free of excess hassle and potential problems." He stated, "We support what they do. We only feel that this is not the place for it. * * * [I]t is my opinion that the area should—is a residential area. It should remain residential for the benefit of the people who live there and the ones who care to move there as residents."

Other opponents (Johnson, Ms. Johnson, Ms. Trim) mirrored Cooper's sentiments. For instance, Johnson argued: "We live together in single-family homes, and that's the way we want to keep it." Ms. Johnson argued: "[W]e would hope that the Council would deny this because we made an investment years ago." Ms. Trim argued: "We know that from surrounding property in Brookhollow that once they are allowed to come in with a special permit, there is going to be rezoning, and once it is rezoned, Brookhollow will be gone, because that is what opens the door to everybody else that comes in, industrially."

Following those presentations, various Council members spoke. Councilman Chip Reno made the following statement, framing his opposition to the granting of the permit by denouncing prior judicial interpretation of the FHAA:

> Mr. Peden did a fantastic job explaining to you what the law was, and we have heard from our attorneys what the law has been in terms of its interpretation

by the courts. I think that interpretation is unjust. I will explain why.

According to the interpretation, any residence basically in the City of Jackson R–1, R–1A, can be purchased and application petitioned for special use in order that a handicapped group home can go into that location. Therefore, Chip Reno next door to his home, someone could purchase that particular home in a neighborhood and petition for that type of use. And I submit that that is wrong. The judicial interpretation of this particular piece of legislation from the Congress is absolutely, positively wrong.

Councilman Darryl Neely stated that "I think we agree that what Christians in Action is trying to do is needed in Jackson." He also said, referring to Councilman Reno's statement opposing the use permit, that "I agree with Mr. Reno * * *."

Councilman William R. "Bo" Brown, in whose ward CIA had sought to relocate its shelter, stated that "I'm delighted to hear my fellow Council members express the same as my position on the issue." Councilman Brown also questioned whether the children were "handicapped," stating, "I don't see how these children are denied any of life's major activities because they are going to school, they are playing, they are eating, they are getting medical attention, and all those type things."

The Council then voted 5–0 to deny the permit. The official order of the City memorializing the denial simply stated that since the subject property was in an R–1 Residential District and the requested use permit "would have an adverse effect on adjacent land uses, the recommendation of the Planning Board is therefore accepted, and the requested Use Permit * * * is hereby denied." Unfortunately, the City Council failed, as had the Planning Board, to state why the requested accommodation

would not have constituted a "reasonable accommodation" within the meaning of this court's prior interpretation of § 804(f)(3)(B) and the Consent Decree in this case.

Section V of the Consent Decree in this case obligated the United States to try to resolve informally any differences regarding compliance by the City with the Decree prior to bringing such differences to this court for resolution, *see* Consent Decree, p. 8. In obedience to this directive, the United States sent the City a letter on September 22, 2000, questioning the denial and asking the City to provide by October 13 the following information: (1) all reasons for its rejection of the application by the CIA for a use permit and identifying any evidence not in the record before the Planning Board and the Council relied upon by the City; (2) whether the City had concluded that the children did not qualify as "handicapped" within the meaning of the FHAA and, if so, identifying any evidence in the record taken into account by the City; and (3) what evidence demonstrated that the accommodation requested by CIA was neither "reasonable" nor "necessary" under the standard for granting reasonable accommodations set forth in this court's October, 1997, Order.

The City did not provide the information requested by the United States by October 13; instead, the City voted on October 24 to reconsider its order of denial. Undoubtedly, that action was taken as a result of the correspondence from the United States questioning whether the denial violated the Decree. Thereafter, the Council took up the issue of the requested permit at a special meeting held on November 7, 2000.

The Council considered no new evidence other than the previously made record before the Planning Board, although both supporters and opponents of the permit were again permitted to make brief presentations. At the hearing, Peden again argued on behalf of CIA, summarizing once more the record CIA had made in the proceedings which included the evidence provided by Lusteck as to the application's compliance with the City's criteria for a use permit and that provided by Dr. Jolly as to the "handicapped" status of the children served by CIA. Peden emphasized that his client was "not seeking rezoning" but rather "simply seeking a use permit as a reasonable accommodation under the Fair Housing Act and this City's Zoning Ordinance." He added that: "The City's own Zoning Ordinance requires that this Council apply the reasonable accommodations provisions of the Fair Housing Act to the use permit application, and this Council should do so consistent with Judge Wingate's ruling in the *Michael* case."

Neighborhood residents again spoke against the permit. James Cooper, who represented the Brookhollow Place Neighborhood Association, stated he "want[ed] to enter [on] the record by saying we still are basing our position on saving the integrity of the neighborhood." He also stated he opposed the CIA's use of the home because of the "potential controversy" posed by the parents of the children, although "agree[ing]" that the children themselves were "no threat to the neighborhood and so forth." Finally, he asserted that "Washington [D.C.] has no business contradicting what goes on here in Jackson, Mississippi, in my opinion," and that the Brookhollow Place subdivision sought that it "be given the right to not have this in our community," since the community was "try[ing]" to be a place where we can raise our families and a place were we can come to after we have a hard day at work and this is home."

Frederick Johnson also opposed the permit, asserting that there were other locations CIA "could have located easily." He

criticized CIA witnesses Jolly, Peden, and Lusteck as having been paid by CIA. He also asserted that "a child with abuses is to me a threat," and implied that the definition of "handicapped" meant that a person must be "incapable of living independently," requiring "around the clock" care.

The City's Deputy City Attorney addressed the Council, listing the six generally applicable factors to be considered by the Council in reviewing use permit requests and referencing the "reasonable accommodations" provisions of the FHAA. In her presentation, she noted that the Act protected the right of persons with disabilities to choose where they wanted to live and that "[i]t is true that the children do not all have to be defined as 'handicapped' based on case law, in order for [the FHAA] to apply to the shelter." Beyond that, however, she did not offer her views on the merits of the request.

Thereafter, members of the Council briefly spoke. Councilman Brown, despite what the Deputy City Attorney had advised as to the law, asserted that all residents of the group home had to be a member of the protected class for the protections of the FHAA to apply and expressed doubt as to "handicapped" status of the CIA children. Councilmen Leslie B. McLemore and Ben Allen, as well as Councilwoman Margaret Barrett–Simon, went on record as now supporting approval of the permit. Councilman McLemore, explaining his vote, stated, "I don't want to get into the business of defying Consent Decrees," and offered an amendment which passed and which provided that the use permit, if granted, would be granted "exclusively" to CIA and would not be "transferable to another organization." Neither Councilman Reno nor Councilman Neely spoke. Thereafter, the Council voted on the motion to grant the permit, which was defeated on a tie vote of three-to-three. Councilmen Brown, Neely, and Reno voted against the motion.

On December 8, 2000, the City sent a letter formally responding to the United States' September 22 correspondence. The City's response, choosing not to address the specific inquiries made by the United States, failed to specify reasons for the City's rejection of CIA's application; offered no clarification as to whether the City had concluded that the children did not qualify as "handicapped" within the meaning of the FHAA; and provided no specific information demonstrating that the accommodation sought was neither "reasonable" nor "necessary" under the standard for granting reasonable accommodations as set forth in this court's October, 1997, Order. The City, instead, boldly stated, "It is the City of Jackson's position that its records and orders speak for themselves. It is the City's position that it acted properly in denying the above referenced petition."

Upon the United States' receipt of the City's December 8, 2000, correspondence, and in the wake of the City's second denial of CIA's May, 2000, application for a reasonable accommodation, the United States filed its motion for civil contempt and supplemental relief on January 16, 2001.

Apparently, the United States' filing of that motion spurred the City to once again reconsider its denial. On January 23, 2001, the City Council passed a motion to reconsider the order denying CIA's petition. The official notice of the motion says as much. That notice, issued by William Hardin, the City's Zoning Administrator, stated, "[t]he motion to reconsider was passed as a result of the United States Justice Department filing a Motion for Civil Contempt in relation to the above referenced matter."

Thereafter, the Council voted again on the use permit. This time the vote was 3–

2 in favor of CIA's petition, with two councilmen absent.

At oral argument before this court, the City admitted that it had undertaken no additional investigation as to the "handicapped" status of the children to be housed by CIA and had never secured any documentation contradicting the showing which CIA had made as to the status of the children. The City even conceded that once the "handicapped" status of the children had been established, it had been obligated to provide the accommodation requested under the applicable standards.

## CONCLUSIONS OF LAW

### Appropriateness of Summary Judgment

Fed.R.Civ.P. 56(c) provides that summary judgment is warranted when the moving party demonstrates that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Where that standard is met in civil contempt proceedings, summary judgment may be granted. *See Rambo v. Morehouse Parish School Bd.*, 37 F.Supp.2d 482, 484 (W.D.La.1999) (noting that summary judgment was appropriate in civil contempt proceeding to enforce remedial order in a school desegregation case); and *EEOC v. Local 580*, 1988 WL 131293 *9 and n. 1, *aff'd*, 925 F.2d 588 (2d Cir.1991) (granting summary judgment in civil contempt proceeding to enforce a consent decree in a Title VII suit and noting that Rule 56 "provides the proper analogue for a motion that decision be rendered on submissions in a contempt proceeding * * *."). Here, as in the original proceedings, summary judgment is appropriate, for the City conceded at oral argument that there was no dispute as to the material facts in this case.

### Jurisdiction

■ This court has jurisdiction of this proceeding under Title 28 U.S.C. § 1345[6] and Title 42 U.S.C. § 3614,[7] for proceedings for civil contempt and supplemental relief are part of the original cause. *Gompers v. Buck's Stove & Range Co.*, 221 U.S. 418, 446, 31 S.Ct. 492, 55 L.Ed. 797 (1911) (civil contempt); and *System Federation v. Wright*, 364 U.S. 642, 81 S.Ct. 368, 371, 5 L.Ed.2d 349 (1961) (supplemental relief).

### Civil Contempt and Supplemental Relief

■ Federal courts have the inherent power to enforce compliance with an injunction through civil contempt proceedings, *Spallone v. United States*, 493 U.S. 265, 276, 110 S.Ct. 625, 107 L.Ed.2d 644 (1990); *Shillitani v. United States*, 384

---

**6.** Title 28 U.S.C. § 1345 provides that, "[e]xcept as otherwise provided by Act of Congress, the district courts shall have original jurisdiction of all civil actions, suits or proceedings commenced by the United States, or by any agency or officer thereof expressly authorized to sue by Act of Congress."

**7.** Title 42 U.S.C. § 3614(b)provides that, "[o]n referral of discriminatory housing practice or conciliation agreement for enforcement

(1)(A) The Attorney General may commence a civil action in any appropriate United States district court for appropriate relief with respect to a discriminatory housing practice referred to the Attorney General by the Secretary under section 3610(g) of this title.

(B) A civil action under this paragraph may be commenced not later than the expiration of 18 months after the date of the occurrence or the termination of the alleged discriminatory housing practice.

(2)(A) The Attorney General may commence a civil action in any appropriate United States district court for appropriate relief with respect to breach of a conciliation agreement referred to the Attorney General by the Secretary under section 3610(c) of this title.

(B) A civil action may be commenced under this paragraph not later than the expiration of 90 days after the referral of the alleged breach under section 3610(c) of this title."

U.S. 364, 370, 86 S.Ct. 1531, 16 L.Ed.2d 622 (1966); and *United States v. McMillan*, 53 F.Supp.2d 895, 907 (S.D.Miss.1999) (Wingate, J.), and to grant appropriate supplemental relief, over and above the relief contained in the original injunction, "if the circumstances, whether of law or fact, obtaining at the time of its issuance have changed or new ones have arisen." *System Federation v. Wright*, 364 U.S. at 647, 81 S.Ct. at 370. Moreover, "[w]hen a district court's order is necessary to remedy past discrimination, the court has an additional basis for the exercise of broad equitable powers." *Spallone*, 493 U.S. at 276, 110 S.Ct. at 632 (approving use of contempt sanctions "as a means of ensuring compliance" against a city which had failed to comply with a consent judgment implementing a remedy for violations of the Fair Housing Act); and *Rambo*, 37 F.Supp.2d at 490 (citing *Spallone* ). Simply put, an injunction entered in a case under the FHAA, as here, "assure[s] that contempt will be a *ready weapon* in case of violation by any of the covered parties." *United States v. Pelzer Realty*, 537 F.2d 841, 844 (5th Cir.1976) (emphasis supplied). This is so because "[f]ederal courts are not reduced to issuing injunctions and hoping for compliance. Once issued, an injunction may be enforced." *Hutto v. Finney*, 437 U.S. 678, 690, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978). In addition to the inherent power of a court to enforce a previously issued injunction, the Consent Decree in this case specifically provided that, in the event of noncompliance by the City, the United States could move for "any remedy authorized by law or equity * * *."

■ Civil contempt can serve two purposes. *Sizzler Family Steak Houses v. Western Sizzlin Steak House, Inc.*, 793 F.2d 1529, 1534, *reh. denied*, 797 F.2d 982 (11th Cir.1986); *McMillan*, 53 F.Supp.2d at 895. It can serve as a coercive "sanction to enforce compliance with an order of the court or to compensate for losses or damages sustained by reason of noncompliance." *Cook v. Ochsner Foundation Hospital*, 559 F.2d 270, 272 (5th Cir.1977). Accord: *United States v. United Mine Workers*, 330 U.S. 258, 304–05, 67 S.Ct. 677, 91 L.Ed. 884 (1947); *McMillan, supra; United States v. Dinwiddie*, 885 F.Supp. 1299, 1304 (W.D.Mo.1995).

■ Compensatory civil contempt "includes losses flowing from noncompliance and expenses reasonably and necessarily incurred in the attempt to enforce compliance." *Norman Bridge Drug Co. v. Banner*, 529 F.2d 822, 827 (5th Cir.1976). In *Cook, supra*, the Court of Appeals for the Fifth Circuit held that "the cost of bringing the violation to the attention of the court is part of the damages suffered by the prevailing party * * *," and such damages may include an award of attorneys' fees to that party. *Id.* Accordingly, where the United States is the prevailing party, it may recover its "damages equal to the costs, expenses, and attorneys fees incurred by [it] in any activity related to the civil contempt phase of [the] case, including but not limited to the motion, hearing, and post-hearing suggestions." *Dinwiddie*, 885 F.Supp. at 1305; *United States v. Greyhound*, 370 F.Supp. 881, 886 (N.D.Ill. 1974).

■ The United States may also seek damages on behalf of any persons who were injured by a defendant's failure to comply with a previously issued injunction "even though that party is not a named party to the underlying litigation." *Dinwiddie, supra* (in a civil contempt proceeding brought by the United States to enforce an injunction issued under the Freedom of Access to Clinic Entrances Act, Title 18 U.S.C. § 248, court awarded damages to three victims for infliction of emotional distress and to Planned Parenthood "for the fair market value of the

services of the three victims and other witnesses that were foregone to prepare for and participate in, the civil contempt hearing.").[8]

Because the language of the injunction closely tracks the prohibitions of the Act in the present case, conduct which violates the provisions of the FHAA, Title 42 U.S.C. §§ 3601–3619, constitutes civil contempt of the injunctive order of this court as memorialized in the Consent Decree, *see United States v. Hill,* 298 F.Supp. 1221, 1236 (D.Conn.1969). Here, the prohibitive injunction of the Consent Decree expressly provides that the City shall not "discriminate" in housing and provides that the term

> "discriminate" * * * refer[s] to what the term "discrimination" includes under Section 804(f)(3) of the Fair Housing Act, as amended, 42 U.S.C. § 3604(f)(3), including any refusal to make accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford a handicapped person equal opportunity to use and enjoy a dwelling.

Consent Decree, § 1, pp. 3–4. Accordingly, the provisions of the Consent Decree and the statute, as this court has noted in analogous circumstances, "are intertwined in a manner that in the instant case may lead to the conclusion by the court that both have been violated." *See McMillan,* 53 F.Supp.2d at 897 (civil contempt of a consent decree entered to remedy violation of the Freedom of Access to Clinic Entrances Act ("FACE"), Title 18 U.S.C. § 248).

### CIA Is Entitled to Protection Under the FHAA and the Consent Decree Because of the Handicapped Status of the Children That it Serves

■ The uncontradicted evidence presented to the City by CIA in support of its request for a reasonable accommodation, and relied upon by the United States in support of its motion, demonstrates that virtually all the children who reside at the CIA shelter are "handicapped" within the meaning of the FHAA and the City's amended Zoning Ordinance. Section 802(h) of the FHAA, Title 42 U.S.C. § 3602(h), provides:

> "Handicap" means, with respect to a person -
>
> (1) a physical or mental impairment which substantially limits one or more of such person's major life activities,
>
> (2) a record of having such an impairment, or
>
> (3) being regarded as having such an impairment, but such term does not include current, illegal use of or addiction

---

**8.** In *Northside Realty Associates v. U.S.,* 605 F.2d 1348, 1355 (5th Cir.1979), the Court of Appeals, while not "foreclos[ing] altogether the possibility" of approving the award of damages to nonparties in a civil contempt proceeding by the United States to enforce an injunction under the Fair Housing Act, declined to authorize such relief in that case. At the time of that litigation, the Act did not authorize the United States to seek such relief in an original "pattern or practice" case. *See e.g., United States v. Mitchell,* 580 F.2d 789 (5th Cir.1978). In 1988, however, Congress enacted the FHAA which amended the original Act to provide specifically that "in a [pattern or practice] civil action under [42 U.S.C. § 3614(a)], the court—* * * may award such other relief as the court deems appropriate, including monetary damages to persons aggrieved [.]" Title 42 U.S.C. § 3614(d)(1)(B). Because civil contempt proceedings are part of the original cause of action, *see Gompers, supra;* because the FHAA now expressly permits the United States to seek damages on behalf of aggrieved persons; and because the Consent Decree provides that (at pp. 7–8) this court may "impose any remedy authorized by law or equity, including * * * any damages * * * which may be occasioned by the City's violation of this Consent Decree," the United States may seek any such damages in this proceeding.

to a controlled substance (as defined in section 802 of Title 21).

Regulations issued by the Department of Housing and Urban Development implementing the Act provide further guidance.[9] Under these regulations, "handicap" is defined in relevant part as "any mental psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities." 24 C.F.R. § 100.201(a)(2) (1999). "Major life activities" are defined as "functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." *Id.* at § 100.201(b).

On the basis of the uncontradicted facts presented on the record to the City and relied upon by the United States in support of its motion, this court readily concludes that virtually all of the children who reside at the CIA emergency shelter are "handicapped" within the meaning of the FHAA and its implementing regulations and applicable precedent. *See United States v. Massachusetts Industrial Finance Agency,* 910 F.Supp. 21, 26 (D.Mass. 1996) (*"MIFA"*) (granting summary judgment on the issue of whether the emotionally disturbed students of a residential school were "handicapped" under the FHAA and noting that the "students at issue suffered one or more emotional or mental illnesses that substantially limited their ability to learn and work in a regular environment."). Such evidence was clearly on the record and available to the City as of the June 28, 2000, Planning Board fact-finding hearing, and there is no reason why the City could not have recognized the import of such evidence when the Council *first* denied the requested accommodation on September 6 and again on November 7, 2000. Indeed, the City conceded at oral argument that the children cared for by CIA at its emergency shelter do—both factually and legally—meet the statutory definition of persons with "handicaps."

**The City's Denial of CIA's Application Violated Its Duty to Provide A Reasonable Accommodation Under the FHAA and the Consent Decree**

In enacting the FHAA, "Congress took particular note of how local zoning had been used to discriminate and thus affect housing opportunities for the disabled [,]" *Groome Resources Ltd., LLC v. Parish of Jefferson,* 234 F.3d 192, 202 (5th Cir.2000). As the Fifth Circuit Court of Appeals in that case observed, "The 'reasonable accommodations' language, now codified in 42 U.S.C. § 3604(f)(3)(B), specifically targeted the type of zoning regulations [single-family residential] at issue here. Congress found that these seemingly 'neutral rules and regulations,' even those involving commercial/noncommercial zoning distinctions, * * * had a discriminatory effect on the housing choices available for the disabled." *Groome,* 234 F.3d at 201–202.

This court's initial liability decision endeavored to set forth a paradigm for analyzing such "reasonable accommodation" claims. That paradigm represents the "law of the case."[10] Under that para-

---

9. When Congress amended the Act in 1988, it explicitly authorized the Secretary of the Department of Housing and Urban Development to issue legislative rules to implement the Act. Title 42 U.S.C. § 3614a. "As the agency directed by Congress to issue implementing regulations, * * * the Department's views are entitled to deference." *Bragdon v. Abbott,* 524 U.S. 624, 646, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998) (deference accorded Justice Department regulations implementing the ADA).

10. *See Arizona v. California,* 460 U.S. 605, 618 n. 8, 103 S.Ct. 1382, 75 L.Ed.2d 318 (1983) (noting that when a court makes a ruling of law, its decision governs the same issues in subsequent stages in the case unless that decision is clearly erroneous and would work a manifest injustice).

digm, this court followed a "two-part" inquiry: (1) "whether [the] sought after accommodation was 'reasonable'." Mem. Op., p. 28 and *see id.*, pp. 34–38 (applying law and discussing evidence supporting "reasonableness" determination); and (2) "whether the accommodation being sought 'may be necessary' to allow disabled persons 'equal opportunity to use and enjoy a dwelling.'" Mem. Op., p. 28 and *see id.*, pp. 40–43 (applying law and discussing evidence supporting "necessity" determination). Finding that the requested accommodation was both "reasonable" and "necessary," this court concluded that the City had violated the FHAA. Mem. Op., p. 43. Both requirements are met by the CIA's request for a reasonable accommodation at issue in the present civil contempt proceedings. Indeed, at oral argument, the City conceded that CIA had been entitled to the accommodation sought and which it belatedly granted on January 30, 2001.

## The Accommodation Sought Was Reasonable And Imposed No Undue Financial Or Administrative Burden

An accommodation is "reasonable" under the FHAA unless it imposes an undue financial and administrative burden on the defendant or requires a fundamental alteration in the nature of the program at issue, which in this case is the City's zoning scheme. Mem. Op., p. 34.

### Lack of Undue Financial or Administrative Burden

Here, the City would not have incurred any undue financial or administrative burden by granting the use permit to CIA on September 6, 2001. Under its amended Zoning Ordinance, the City has an established administrative procedure for the submission, consideration, and granting of use permits for group homes for the handicapped. Zoning Ordinance, §§ 602.02.03.4; 1701.01–A. Accordingly, granting the use permit would not have entailed any financial or administrative burdens beyond those contemplated by the Ordinance, which the City amended pursuant to the relief ordained by the Consent Decree. *Cf.* Mem. Op., p. 34 (noting presence of "established administrative procedure" in concluding City would not have incurred "an undue financial or administrative burden" in granting accommodation).

### Lack of A Fundamental Alteration in Zoning Scheme Or Single–Family Residential Character of Neighborhood

Nor would granting the use permit have fundamentally altered the City's zoning scheme or changed the single-family residential character of the Brookhollow Place subdivision where CIA sought to relocate. *See* Mem. Op., pp. 34, 39. The undisputed evidence discussed at length in this Opinion's section entitled "Findings of Fact" shows that it would not result in any such fundamental alteration for the following reasons:

**First:** As with the Cypress Cove group home at issue in the original decision, the CIA group home "would have remained entirely consistent with single-family residential use." Mem. Op., p. 35. Indeed, the amended Zoning Ordinance, Section 602.02.1, now provides that group homes for the handicapped housing six or fewer residents, excluding staff, are a permitted use as of right in an R–1 Single Family Residential District and further provides, in § 1701.01–A, that those uses for which a use permit is required are those which are "generally compatible" with the land uses permitted in a district. Indeed, the use of the residence proposed by the CIA—that is, as an emergency shelter home—is not unlike the use of such a residence by a family. As counsel for CIA pointed out to the City, the CIA emergency shelter "provides nutritious meals; appropriate bedroom, bathroom, and dining space; and a safe, clean, secure, and

healthy environment." As planning expert Joseph Lusteck attested to in his analysis of the proposed use, "Inspection of the property confirms that the use requested *is compatible* with the [single family residential] character of development in the area * * *." (Emphasis supplied).

Here, the only real difference between a group home permitted as of right under the City's amended Zoning Ordinance and one subject to a use permit is the number of children sought to be served by CIA. City Zoning Administrator Hardin conceded to the Planning Board "that they [the CIA proponents] don't have to be here today to have six" since the amended Zoning Ordinance permitted such group homes for the handicapped "as a matter or right in all residential districts * * *."[11] At CIA, the average number of children present at any given time would have been seven and most of these children would have been only five years old or less. Moreover, this court noted in its 1997 liability decision that there were "more than 15 child care centers in the City's R–1 and R–1A zones" and that "some centers operated and continue to operate in such districts with upwards of 30 or more children." Mem. Op., p. 6, n. 8. Given such prior practices, the CIA group home, which resembles and functions more as a residence than a child care center, would not have presented any sort of anomaly in an R–1 district.

**Secondly:** Characterizing CIA's non-profit shelter as a "business," as some of the neighborhood opponents had done, would not defeat its right to protection under the FHAA or the Consent Decree.

As the Court of Appeals for this Circuit recognized in *Groome*, 234 F.3d at 202, n. 14, group homes—even if they are "commercial"—"may be the only way for disabled individuals to live in a residential community * * *." *See also Smith and Lee Associates v. City of Taylor, Mich.*, 13 F.3d 920, 931 (6th Cir.1993) (holding that persons with disabilities "may have little choice but to live in a commercial home if they desire to live in a residential neighborhood."); *Avalon Residential Care Homes, Inc. v. City of Dallas*, 130 F.Supp.2d 833, 841 (N.D.Tex.2000) ("The fact that the [group home] is a business should not be the basis for denying an accommodation when reasonable and necessary."). Moreover, this court concluded in its initial liability decision that it was "impossible for the City to defend the claim that granting Cypress Cove a special exception would have 'fundamentally altered' the City's zoning scheme by permitting a 'business' to operate in an R–1 zone" because the "City permits and often authorizes in its R–1 districts other business uses [which may] be just as potentially 'intrusive' * * *." Mem. Op., p. 38. The same reasoning applies to the present proceeding.

**Thirdly:** Granting CIA the use permit posed no threat of altering the character of single-family neighborhoods because the notion of a use permit runs counter to the prospect of permanent or fundamental land use change. As noted above, uses permitted by a use permit are, by nature, generally compatible with the underlying district. Additionally, under the Zoning

**11.** Indeed, the 3.14 acre lot comprising the subject property could have supported up to fourteen single-family residences under the minimum lot size requirements for single-family residences in an R–1 district (referencing Lusteck Report analysis) and each of those homes could have had six "handicapped" residents, as of right, or traditional families of more than one person. Accordingly, given the potential number of persons (84) that could live on the subject property under applicable zoning for a lot that size, the proposed number of residents at the CIA shelter—seven to twelve—can hardly be found to the "inconsistent" with the character of the neighborhood.

Ordinance, a use permit "may be issued subject to such conditions as are * * * necessary to prevent or minimize adverse effects upon other property in the neighborhood * * *." Zoning Ordinance, § 1701.03–A. Here, some of the opposition was fueled by the unsubstantiated fear that granting a use permit would result in a rezoning of the neighborhood which would then be opened to commercial development and apartments. The record is clear that the May, 2001, CIA application, however, was not a rezoning request.

■ **Fourthly:** As for the stated fears of a rise in crime, those fears appear predicated upon a type of housing (apartments) or businesses not at issue in the CIA application. While the FHAA contains a narrow exemption to coverage where "an individual['s] * * * tenancy would constitute a direct threat to the health or safety of other individuals or whose tenancy would result in substantial physical damage to the property of others." Title 42 U.S.C. § 3604(f)(9), invocation of that exemption requires objective evidence regarding particular individuals and may not be based upon unsubstantiated inferences. *MIFA,* 910 F.Supp. at 26. As the Fifth Circuit Court of Appeals recently recognized, " 'Generalized perceptions about disabilities and unfounded speculations about threats to safety are specifically rejected as grounds to justify exclusion.' " *Groome Resources,* 234 F.3d at 201, quoting H.R.Rep. No. 100–711, at 18 (1988), *reprinted in* 1988 U.S.C.C.A.N. 2173, 2179. No objective evidence of any direct threat was presented to the City. Given that the large majority of the children at the shelter would be between infancy and five years of age, this lack of such evidence is hardly surprising. Indeed, it would be anomalous for the City to conclude that the shelter presented any sort of threat to its citizens, since the City's Police Department uses the shelter as a location to take abused or neglected children.

**Fifthly:** The impact of granting CIA a use permit would have been no different than that of other residential uses permitted either as of right or as a matter of practice in R–1 districts. *See* Mem. Op., p. 39 (noting "the fact that there is no evidence showing that the impact of the group of disabled individuals would be any more detrimental to the surrounding neighborhood than that of a group of, say, ten unrelated, nondisabled college students" and that the City of Jackson "has never enforced" its "prohibition against more than four unrelated individuals living together in one home" in its R–1 residential district). Moreover, while the protestors expressed some concern about the effect of the CIA home on their property values, they presented no evidence to support their contention. Indeed, the only evidence presented was to the contrary.

**Sixthly:** The City cannot justify its denial of the CIA use permit and failure to comply with the injunctive mandate in this case based upon a "not in my backyard" predilection of neighborhood residents or the desire of the City to rely upon its traditional authority in zoning disputes:

While the incantation of 'local zoning' and 'traditional' authority is present in this case * * *, it does not serve the balance of federalism to allow local communities to discriminate against the disabled. Local authorities cannot 'experiment' by creating communities that exclude the disabled any more than local authorities can experiment by excluding minorities. Further, the FHAA was passed precisely because the political voice of the disabled was silenced in local debates as they were not allowed to move into the neighborhood in the first instance.

*Groome Resources,* 234 F.3d at 215. "Private biases may be outside the reach of the law, but the law cannot, directly or indi-

rectly, give them effect." *Palmore v. Sidoti,* 466 U.S. 429, 433, 104 S.Ct. 1879, 80 L.Ed.2d 421 (1984); *United States v. City of Yonkers,* 96 F.3d 600, 612 (2nd Cir.1996) (Fair Housing).

As this court has expressly held, "Making disabled persons go somewhere else in town to live is simply no defense to a claim of housing discrimination." Mem. Op., p. 33. Yet, the City's denial appears motivated by just such an animus. This animus was evidenced most strikingly by the comments of Councilman Reno at the September 6 Council meeting, explaining why— *despite* what the Council had "heard from our attorneys [as to] what the law has been in terms of its interpretation by the courts"—he would vote against the use permit sought by CIA:

> According to the interpretation [of the FHAA by the courts], any residence basically in the City of Jackson R–1, R–1A, can be purchased and application petitioned for special use in order that a handicapped group home can go into that location. Therefore, Chip Reno next door to his home, someone could purchase that particular home in a neighborhood and petition for that type of use. And I submit that that is wrong. *The judicial interpretation of this particular piece of legislation from the Congress is absolutely, positively wrong.*

(Emphasis supplied).

Councilman Reno's comments were adopted as their own by Councilmen Neely and Brown at the Council meeting on September 6 when the CIA request was unanimously denied by a 5–0 vote. Significantly, it was the votes of Councilmen Reno, Brown, and Neely which doomed the CIA's second request for a permit in the vote on November 7.

While publicly touting their judicial interpretations of the Act in question, these Councilmen apparently forgot that the City had taken no appeal of the initial liability decision in this case and voluntarily had entered into the Consent Decree designed to remedy the earlier violation found by this court. As this court itself recently observed in another civil contempt proceeding, a defendant may not "treat this court's lawful orders as mere sham and inapplicable to what [the defendant] believes [it] can do notwithstanding the Consent Decree." *McMillan,* 53 F.Supp.2d at 907.

**Seventhly:** The record before the City demonstrated that CIA's application met each of the six factors to be considered by the City Council—aside from its overarching obligation to provide reasonable accommodations for group homes for the handicapped—in approving use permits in general. That record is devoid of any objective evidence to the contrary demonstrating that those six factors were not met. In any event, the City was obligated to consider the request under the "reasonable accommodation" paradigm and could not treat the request for a use permit solely by reference to its generally applicable factors. *See Rambo,* 37 F.Supp.2d at 486 (noting that it was "wide of the mark" for a school board in civil contempt proceedings to argue that it had relied upon its traditional authority to make placement decisions without utilizing procedures mandated by a prior remedial order).

In sum, granting CIA the use permit on September 6 would not have fundamentally altered either the character of the City's single-family zoning or of Brookhollow Place. Nor would it have imposed any undue financial or administrative burden on the City. Accordingly, granting the permit would have been "reasonable" under the City's amended Zoning Ordinance, the FHAA, and—perhaps most importantly— the Consent Decree in this case.

### The Accommodation Sought Was Necessary

#### The Use Permit Was "Necessary" to Afford the CIA Residents An Equal Opportunity to Live in the Home of Their Choice

■ In its initial liability decision, this court applied a "plain reading" to the language of § 804(f)(3)(B) of the FHAA and concluded that the necessity requirement "is satisfied when, absent an accommodation * * *, handicapped persons would be denied 'equal opportunity to use and enjoy a dwelling.'" Mem. Op., p. 40. This court emphasized that "the FHAA gives handicapped persons the right to live in the residence of their choice. This right extends to *all* areas in a city, including single-family neighborhoods." *Id.* (emphasis in original). Here, based on its conclusion that its current house is old, outdated, expensive to maintain, and situated in a neighborhood which is unsuitable for a children's shelter, CIA has chosen to relocate. Yet, despite the clear directive of this court that the right to choose includes the right to reside in all areas of the City, the City has ignored that directive by unjustifiably denying CIA its requested use permit.

It is no answer to the CIA request that the City of Jackson has previously accorded it the right to operate its shelter in its present location. Restricting CIA to that location, based on a desire to accede the insular preferences of residents of Brookhollow Place without any legitimate reason, denies persons with disabilities "equal opportunity" to live in the housing of their choice. *See Groome Resources*, 234 F.3d at 216 ("The * * * reasonable accommodations provision simply prohibits discrimination in housing against the disabled by providing equal access to housing options."). Indeed, this court, in its initial liability decision, specifically rejected a defense by the City, which had argued that

"although it refused Cyprus Cove's particular request * * *, it nevertheless satisfied its obligations under § 804(f)(3)(B) by permitting [it] to operate * * * in other areas of the City reserved for such homes * * *," Mem. Op., p. 30. As this court held:

> The City's argument finds no support in relevant case law. The reason is straightforward: it justifies an exclusionary policy which is fundamentally inconsistent with Congress' goal of "end[ing] the unnecessary exclusion of the handicapped from the American mainstream," H.R. Rep. 711 at 18, and with the FHAA's corresponding guarantee that the disabled be afforded equal opportunity to live, not in *some* residence in the community, but rather in the residence *of their choice.*

Mem. Op., p. 30 (emphasis in original). *See also Assisted Living Associates of Moorestown v. Moorestown Twp.*, 996 F.Supp. 409, 437 (D.N.J.1998) ("The FHA is a declaration of congressional policy that the handicapped can no longer be relegated to the periphery or transitional zones within our communities and that the handicapped must be as free as anyone else to choose where to live."). Accordingly, an accommodation was "necessary"—in the plainest sense of the word—to afford the prospective residents of CIA an equal opportunity to the home of their choice.

#### The Use Permit Was Also "Necessary" Because of the Critical Need for the CIA Shelter and Because it Would Have Enhanced the Quality of Life for CIA's Resident Children

In its earlier decision, this court alternatively ruled that the concept of "necessity" under the FHAA includes the concept that the desired accommodation affirmatively enhance the quality of life of a person with a disability by ameliorating the effects of that disability. Mem. Op., p. 41, quoting

*Bronk v. Ineichen,* 54 F.3d 425, 429 (7th Cir.1995). Emergency shelters such as the one operated by CIA provide a beneficial living environment for abused and neglected children, many of whom are "handicapped" within the meaning of the FHAA. As Dr. Jolly, clinical psychologist for CIA, observed. "The role that your shelter plays in the continuing stream of these children's lives is an important factor, if not the most important factor, in determining how these children will recover and whether they will lead productive lives." Accordingly, the record before the City demonstrated that the CIA shelter enhances the quality of life of its residents by ameliorating the effects of their disabilities.

The accommodation sought from the City was also "necessary" because "there was—and is—a critical need in the City" for such housing. The undisputed record establishes that need. Indeed, even those opposed to the relocation of the shelter to Brookhollow Place recognized the need for it. As Councilman Neely stated at the September 6 hearing. "I think *we all agree* that what Christians in Action is trying to do *is needed* in the City of Jackson." (Emphasis supplied).

In sum, the City's denial of the requested accommodation on September 6 and November 7, 2000, deprived the children of the CIA shelter of the beneficial living environment that is critically needed in the City of Jackson by effectively consigning them to reside in a less desirable location and denying them the housing of their choice. The City, thus, effectively denied them an accommodation which satisfies the "necessity" requirement of the FHAA.

#### The City's Defenses

At oral argument, the City conceded that from the record here one could justifiably conclude that the children to be housed at the CIA emergency shelter were, indeed, "handicapped" under the FHAA. The City also recognized that the permit should have been granted as a "reasonable accommodation" because the City had no legal basis for denying the use permit.

■ Nevertheless, the City argues that this court should not find it in contempt for its denials on September 6 and November 7, 2000, of the requested accommodation because of its action on January 30, 2001, granting the requested permit. The City attempts to characterize those denials as "mere steps to a final resolution." While that "resolution" obviates the need for the coercive daily fine sought by the United States in its motion, "the mere fact that a party may have taken steps toward achieving compliance is not a defense to a contempt charge." *Sizzler Family Steak Houses,* 793 F.2d at 1534, n. 5 (also noting, *id.* at 793 F.2d at 1534, that the defendant had argued that it "had cured or had taken steps to cure all the violations reported by [plaintiff] at the time the contempt judgment was entered").

■ Equally important and fatal to the City's proffered defense is that a violation of the FHAA occurs, as the Fifth Circuit Court of Appeals has held, " 'when the disabled resident is *first* denied a reasonable accommodation, irrespective of the remedies granted in subsequent proceedings.' " *Groome Resources,* 234 F.3d at 199 (quoting *Bryant Woods Inn, Inc. v. Howard County, Md.,* 124 F.3d 597, 602 (4th Cir.1997)) (emphasis supplied). Here, that denial first occurred on September 6, 2000. A "delay in obtaining a valuable thing is an injury" cognizable under the FHAA. *NAACP v. American Family Mutual Ins. Co.,* 978 F.2d 287, 293 (7th Cir. 1992), *cert. denied,* 508 U.S. 907, 113 S.Ct. 2335, 124 L.Ed.2d 247 (1993). Because the Consent Decree in this case is so "intertwined" with the provisions of the Act, this court sees no reason why it should apply a

different standard in a civil contempt proceeding to enforce an injunction entered pursuant to that Act. As noted earlier, once an injunction has issued, courts are not reduced to "hoping for compliance." Here, the grudging issuance of the permit was accomplished only after the United States moved for civil contempt; and the City must be held accountable for its delay in granting it.

■■■ The City also asserts that it has acted in good faith. That assertion, too, is unavailing as to the charge of civil contempt—both legally and factually. First, "good faith" is irrelevant in determining whether civil contempt has occurred and, therefore, is no defense. *See McComb v. Jacksonville Paper Co.,* 336 U.S. 187, 191, 69 S.Ct. 497, 93 L.Ed. 599 (1949); *Waffenschmidt v. MacKay,* 763 F.2d 711, 726 (5th Cir.1985), *cert. denied,* 474 U.S. 1056, 106 S.Ct. 794, 88 L.Ed.2d 771 (1986). *Accord: Stone v. City and Council of San Francisco,* 968 F.2d 850, 856 (9th Cir.1992). *See also Cook,* 559 F.2d at 272 (court has inherent authority to award attorney's fees in an action for civil contempt irrespective of whether the disobedience was willful).

Secondly, even if "good faith" were a defense, and it is not, the record is sorely deficient in evidence that the City acted in "good faith." The Consent Decree in this case addressed matters similar to the one now before this court; and the provisions of that Decree, as well as the original decision in this case, should have cautioned the City not to deny requests for a reasonable accommodation on illegal grounds. Instead, the record is littered with evidence of an unwillingness by City officials

to accept and abide by the prior ruling of this court as to the reach of the FHAA and the Consent Decree.

At oral argument, the City was pressed to conjure up any acceptable justification for its refusal to grant the permit on September 6, when it was first presented to the City Council based upon the extensive factual record developed before the Planning Board. Moreover, the City admitted that it had no new facts available to it on January 30, 2001, that it had not possessed earlier.[12] The only changed circumstance is that the United States filed its motion for civil contempt. The City's belated approval, taken only after the United States had dangled the prospect of coercive daily fines and other relief over the recalcitrant City's head, is hardly the stuff of "good faith."

## Burden of Proof

The burden of proof in this proceeding is on the United States. With respect to the motion for civil contempt, the standard is one of "clear and convincing evidence." *NLRB v. Tupelo Garment Co.,* 122 F.2d 603, 606 (5th Cir.1941). The United States was required to establish: (1) that a court order was in effect; (2) that the order required certain conduct by the City; and (3) that the City failed to comply with the court's order. *McMillan,* 53 F.Supp.2d at 897–98. The court finds that the United States has met its burden in this proceeding.

## Order

Applying the foregoing standards to the court's findings of fact and conclusions of

---

12. The official order of the City memorializing the September 6 denial stated that the City had denied the permit because it "would have an adverse effect on adjacent land uses * * *." At oral argument, however, the City conceded that it had been obligated to grant the permit (as it, in fact, did on January 30) based on the factual record presented on September 6, since there was no new evidence adduced thereafter. Accordingly, this court finds that the reason for denying the permit given by the City in its September 6 order was pretextual, at best, and further evidence of the City's lack of "good faith."

law, it is hereby ORDERED, ADJUDGED, and DECREED that:

1. The City of Jackson is in civil contempt of the injunctive order contained in the December 18, 1997, Consent Decree in this case;

2. The motion of the United States for civil contempt and summary judgment is hereby granted; and

3. Further relief shall be entered by this court following the submission by the United States of documentation as to damages and argument by the parties on the issues of damages and the parameters of appropriate supplemental relief.